17537

C. Birnie JOHNSON, as Administrator of the Estate of W. S. HERRINGTON, Respondent, v. CHARLESTON AND WESTERN CAROLINA RAILWAY COMPANY, Appellant

(108 S. E. (2d) 777)

*Messrs. A. C. Todd,* of Greenwood, and *Brown, Jefferies & Mazursky,* of Barnwell, *for Appellant,*

*Messrs. McNair & Lawton,* of Allendale, and *Randolph Murdaugh,* of Hampton, *for Respondent,*

May 19, 1959.

LEGGE, Justice.

Appellant's main line track and U. S. Highway 321 intersect in the town of Fairfax, S. C. About 1 :00 o'clock a. m. on September 27, 1952, an automobile traveling north on said highway collided with appellant's freight train that was slowly moving across the intersection. W. S. Herrington, one of the occupants of the automobile, was killed; and this action was brought seeking damages for his alleged wrongful death. Verdict was for $67,618 acutal damages. The appeal charges error in the trial judge's refusal of appellant's motions for nonsuit, directed verdict, judgment *n. o. v.*, and new trial.

U. S. Highway 321 runs generally northward from Savannah, Ga. to Columbia, S. C. It passes, due south-north, through Fairfax. Appellant's main line track runs through Fairfax approximately southeast-northwest, crossing U. S. Highway 321 diagonally. Immediately to the south of this crossing, S. C. Highway 28, which parallels appellant's track, also intersects U. S. Highway 321. The north curb of Highway 28 is about fourteen feet from the near rail of appellant's track. Above the center of the intersection of the two highways is the usual highway blinker light, flashing red for traffic on 28 and yellow for traffic on 321.

Approximately three hundred forty-five feet southeast of its intersection with Highway 321, Highway 28 is crossed by appellant's side track. About four hundred forty feet

northwest of its intersection with Highway 321, appellant's main line is crossed by the main line of Seaboard Air Line Railway, which runs south-north. Just beyond the Seabroad crossing, and to the south of appellant's line, is the tower of Seaboard Air Line Railway, which is manned by its telegraph operator.

Five miles northwest of Fairfax, on Highway 28, is the town of Allendale, S. C.; and there U. S. Highway 301, which runs southwest-northeast, intersects 28. About ten miles southwest of Allendale, Highway 301 crosses the Savannah River and enters Screven County, Georgia.

Appellant's train, headed northwest, had been engaged in shifting just prior to the accident. Its three-unit engine had stopped short of the Highway 321 crossing; had proceeded with one car to the Seaboard connections; had picked up some cars on appellant's storage track; and had then backed up and coupled to the cars that had been left on the main line just southeast of the highway intersection. The shifting operation thus completed, the engine, pulling seventy-four cars, proceeded across the intersection. The automobile struck the fifth car.

The automobile, a 1951 Ford, was owned by Mrs. Louise Odom, who lived with Mr. and Mrs. Herrington on their farm in Screven County, Georgia, a few miles west of the Savannah River. At the time of the accident it was being driven by Mrs. Odom's cousin, Wendell Zeigler, aged 23, also a resident of Screven County, Georgia. Mrs. Odom was on the front seat with him; Mr. and Mrs. Herrington were on the rear seat.

The only eyewitnesses to the accident were the occupants of the automobile. Zeigler did not testify. (It appears from the testimony of Mrs. Odom that he had come to Allendale for the purpose of attending the trial, but had been called back to his home in Miami, Florida, because of his child's illness.) The testimony of Mrs. Odom and Mrs. Herrington was substantially as follows:

On Saturday night, September 26, Mrs. Odom invited Mr. and Mrs. Herrington to go with her to have supper at Pine Grove Inn, which is in Screven County, near the Savannah River. They left the Herringtons' home about 10:00 o'clock that evening, Mrs. Odom driving. At Pine Grove Inn, which was operated by Zeigler's mother, they met Zeigler, who had not had supper; and, since they could not get at Pine Grove Inn the seafood that they wanted, they decided to go on to Allendale. Zeigler offered to drive the car, to which Mrs. Odom agreed; and they proceeded on Highway 301 to Allendale, where they found no eating place open. They then took Highway 28 toward Fairfax, stopped briefly at a little eating place between Allendale and Fairfax, and, not being able to get there the kind of food they wanted, proceeded on to Fairfax. At the intersection of Highway 28 with Highway 321 they turned to the right on the latter to go to The Pig, an eating place located on Highway 321 about three miles south of Fairfax. Some ten years before, Mrs. Odom's brother had rented The Pig, and she had operated it for him for a few months. Not being able to get seafood at The Pig, they ordered sandwiches and coffee, which Zeigler got and brought to the car for them. After they had eaten the sandwiches and drunk the coffee, they started back on their way home. Zeigler, who was driving, was unfamiliar with the route, which he had used for the first time earlier that evening, and which on their return home he was to retrace.

A day or so before the accident, a hurricane had struck the area in which Fairfax is located; and the weather was still unsettled. It was not raining when they stopped at Pine Grove Inn; but when they reached Allendale it had begun to drizzle, and when they left The Pig a misty rain and fog had set in. According to both Mrs. Odom and Mrs. Herrington, the fog was quite low and heavy, and Zeigler was using dim headlights for that reason. Both of these witnesses testified that they saw the overhead highway blinker (at the intersection of 321 and 28); and that Zeigler, approaching it, slowed to between ten and fifteen miles per hour. Mrs. Odom

testified that when they reached the blinker light she started to tell Zeigler to turn left into Highway 28, but that before she could do so the automobile, having crossed the highway, struck something, and she was knocked unconscious; that she knew nothing of the railroad crossing adjacent to and just north of Highway 28; that she did not see the freight car, which was unlighted and blended into the fog and darkness; that she saw no railroad signs, by light or otherwise, warning of the presence of the unlighted boxcar across the highway; and that she heard no bell or whistle. Mrs. Herrington testified that she was looking ahead as they approached the highway blinker; that there were no street lights in the vicinity, and the only light visible was the highway blinker; that the night was very dark and visibility poor by reason of the fog; that no warning of the presence of the freight car across the highway was given by flag or by lantern or other light; that she heard no bell or whistle; that if a bell had been ringing or a whistle blowing she would have heard it; and that she never did see the train. She lost consciousness after the collision.

Grover C. Forrester, the sheriff of Allendale County testified for the plaintiff as follows:

In September, 1953, he was a corporal of the State Highway Patrol, and was stationed in Allendale County. On the night of September 26-27 he was on duty at the police station in Allendale; and in response to a telephone call shortly after 1:00 o'clock a. m. he proceeded to Fairfax, arriving at the scene of the accident in time to assist in getting the occupants out of the automobile, which had been dragged by the train along the track northwestward of the Highway 321 crossing a distance of one hundred eighty-six feet. When he arrived at the scene of the accident it was quite misty and raining, and very dark. There was no street light burning at the crossing, and the only light in that immediate vicinity was the highway intersection blinker. No. 321 is a through highway and heavily traveled day and night. Examination of the train showed that the automobile had collided with the fifth car

to the rear of the engine. It was a boxcar of dull color, and there were no lights on it. The railroad crossing is a bad one because of its proximity to the intersection of the two highways, and because the highway blinker light gives no warning of the railroad track. The witness had many times gotten out of his patrol car and flagged the crossing with his signal light when a train was approaching. The railroad cross-arm sign, which is between the north curb of Highway 28 and the track, and twelve feet east of Highways 321, cannot be seen far by one traveling north on 321 unless he is looking for it, because it is obscured by trees, a filling station, and posts. On cross examination he testified that his inspection of the automobile led him to conclude that its right front fender had struck the boxcar, and at no great speed, probably between ten and fifteen miles per hour.

We summarize briefly the testimony on behalf of the defendant bearing upon the immediate circumstances of the accident:

Mr. T. S. Spaugh, who on the night in question was a member of the police department of the town of Fairfax, testified that when appellant's train pulled in he was in front of the police station, which was located on the east side of Highway 321 about a hundred feet north of the railroad track. He stood there, as he usually did during shifting operations, so that he could watch for automobiles approaching the crossing from the north. During the entire movement the bell on the engine was ringing. When the train had cleared the crossing a man drove up and told him that a car had run into the train. The witness then went to the scene, found there the train conductor and the Seaboard towerman, and helped to get the people out of the automobile. The nearest street light was at the southeast corner of Highway 28 at its intersection with Highway 321. There was also a large electric light sign on the hotel at the southwest corner of the highway intersection, which threw a reflection on the railroad crossing. At the time of the accident the night was not exactly dark, but was foggy.

Mr. J. P. Wilkinson, telegraph operator for Seaboard Air Line Railway, was in the railroad tower before referred to. After appellant's train had completed shifting, the witness gave the signal for it to leave. At it was pulling out, he saw sparks flying on its side, as if something was rubbing against it; and he at once ran down the tower stairs, grabbed a lantern, and signalled the conductor to stop the train. Witness saw the automobile "rubbing up and down" on the side of the train. The automobile was visible to him at a distance of three or four hundred feet. At the time of the accident it was not raining; some twenty or thirty minutes after the accident there was a light mist. The witness was the first to reach the automobile. He did not at that time try to get the people out of it, but ran back to the tower and telephoned for a doctor and an ambulance. He smelled alcohol in the car and saw, on the floor by the front seat, a fruit jar about one-third full, which he turned over to the conductor of the train. Upon examination of the crossing the next morning he found tire skidmarks on the west part of the roadway of Highway 321, just south of the track, the skid-marks being ten or fifteen feet in length.

Mr. B. Harrison, flagman, was in the caboose at the rear of the train, doing clerical work, at the time of the accident. He assisted in getting the people out of the automobile. He saw the conductor, who had a half-gallon fruit jar. They opened it and its contents smelled like corn whiskey.

Mr. R. E. Gentry, the brakeman, testified that he flagged the crossing of Highway 321 when the train backed up to couple with the cars that had been left to the east of it; that he then turned the air into the train, walked to the engine, signalled the engineer to go ahead, and got up on one of the diesel units. After the train had stopped in emergency, he got down and walked toward the rear of the train. Visibility was good; he could see five or six hundred feet; it was not raining; there was no fog, but it became misty while he was at the scene of the accident. The bell had been ringing during all of the train movements. The witness did not see any of

the occupants of the automobile; they had been taken to the hospital before he got to the scene. He saw the fruit jar, which was on the ground beside a signal post.

Mr. J. C. Foran, the conductor, had some waybills to hand up to the towerman, and was standing on the top step of the caboose after the shifting operation had been completed and the train was pulling out. When the caboose was within about three car lengths of the Highway 321 crossing, the towerman gave a stop signal with a light; and the witness applied the emergency brake. He ran to the automobile, and he and Wilkinson and Harrison got the people out. He saw a fruit jar, about one-third full, on the floor in front of the front seat. Wilkinson got it out and gave to to Foran, who handed it to a policeman named Barber. Barber opened the jar; its contents smelled like whiskey. The witness later examined the roadway of Highway 321. On its west side, by the track, were scrape-marks where the automobile had apparently been knocked around.

The engineer was Mr. M. J. Ivey. The record shows that he had died prior to the trial.

There was in evidence, for the defendant, a large-scale plat of the crossing and its vicinity, made two days after the accident. It showed U. S. Highway 321 to be straight for some eight hundred feet south of the crossing; a cross-arm railroad sign three and a half feet east of the pavement of 321 and nineteen and a half feet south of appellant's main line track; a circular sign three hundred seventy-five feet south of the track, on the east side of 321; and a highway sign one hundred feet south of the sign last mentioned, indicating a highway junction. Mr. R. M. Collins, who made the plat, testified that there were some palmetto trees on the east side of 321 southward from a point about two hundred feet south of the railroad crossing, but that there was nothing to obstruct the view of the crossing for a distance of three or four hundred feet to the south of it. There was also in evidence, for the plaintiff, a plat of the vicinity made in November, 1957. The testimony on both sides was to the effect

that some changes in the street lighting system had been made between the time of the accident and the time of the trial. Both sides introduced in evidence photographs of the crossing and its vicinity, those introduced by the plaintiff having been taken on October 8, 1953, those for the defendant in November, 1957.

There was a decided conflict in the evidence relating to whiskey. In addition to the testimony of Wilkinson, Harrison and Foran before mentioned, Spaugh testified that he smelled whiskey in the automobile and that Zeigler appeared to be drunk and Mrs. Odom appeared to have been drinking. Also, Dr. Palmer, who treated the injured persons at the Allendale County Hospital in the early morning of September 27, testified that they all had strong alcoholic odor on their breaths, and that one, whom he could not identify, vomited. On the other hand, both Mrs. Odom and Mrs. Herrington swore that none of the party had been drinking and there was no whiskey in the automobile. A Mr. Williams, who had helped to get the occupants out of the automobile, testified that he saw no liquor in it, and that he smelled none either in the car or on any of its occupants. And Sheriff Forrester testified to the same effect.

Several exceptions are based upon the contention that the trial judge erred in refusing appellant's motions for nonsuit, directed verdict, and judgment *n. o. v.*, respectively, because: (a) there was no evidence of actionable negligence on its part; and (b) even if actionable negligence on its part could be inferred, the evidence was susceptible of no reasonable inference other than that the driver of the automobile was guilty of gross contributory negligence. In considering these exceptions we must, of course, view the evidence and the inferences fairly deducible from it in the light most favorable to respondent's case. *Peagler v. Atlantic Coast Line R. Co.*, S. C., 107 S. E. (2d) 15.

The evidence here, already discussed, clearly suggests that the crossing in question was a dangerous one because of the adjacent highway intersection, and that

on the night of the accident, it was especially hazardous because of the condition of the weather and the absence of street lights in the vicinity. Whether in these circumstances due care on the part of appellant required the presence of a flagman or the use of a fusee or other visible warning during the slow movement of the train across Highway 321 was, in our opinion, a jury question. *Miller v. Atlantic Coast Line R. Co.*, 140 S. C. 123, 138 S. E. 675.

There was evidence from which the jury might reasonably have believed that Zeigler was unfamiliar, with this crossing, though he had made the journey from Allendale to Fairfax and thence to The Pig an hour or so before the accident. On that journey he had turned to the right from Highway 28 into Highway 321, and had no occasion to cross the railroad track.

We cannot overlook the testimony offered by respondent to the effect that the statutory crossing signal, by bell or whistle (Code 1952, Section 57-743), was not given. If the jury believed that such signal was not given, and that the failure to give it contributed to the accident, then respondent's recovery could not be defeated by less than gross contributory negligence on Zeigler's part. Code 1952, Section 58-1004. The credibility of that testimony was for the jury, not the trial judge; and it is not our function to pass upon it. Nor can we say, from the record before us, that Zeigler's failure, on the return trip, to make the left turn from 321 into 28 and thus avoid the collision, or his failure to see the boxcar across the highway, was gross contributory negligence as a matter of law.

Two exceptions charge error in refusal of appellant's motion for directed verdict because respondent had failed to prove every one of the alleged joint and concurrent acts of negligence. The complaint alleged, in paragraph 15, that "the train was being operated carelessly, recklessly, negligently, wilfully, wantonly and heedlessly, without any bell ringing or whistle blowing, without any light, signal, sign, flagman, fusee, or warning whatsoever being given."

In paragraph 16 it alleged that after the collision the defendant negligently and recklessly failed to stop the train immediately, but continued to pull the boxcar under which the automobile had been caught. Paragraph 17 alleged that Herrington's death resulted from "the joint and concurrent tortious acts of commission and omission, negligence, carelessness, recklessness, wilfullness, wantonness and heedlessness of the defendant herein, its agents and servants, combining and concurring in the following particulars," which were thereupon set out in thirteen subparagraphs that may be substantially condensed as follows:

(a) Negligent operation of the train under the existing circumstances without a flagman, without giving the statutory signal or any other warning, and failure to stop it immediately after the collision, in violation of the state statutes and of the ordinances of the Town of Fairfax.

(b) Operating the train across a highway without keeping a proper lookout.

(c) Failure to have a flagman on the south side of the crossing throughout the movement of the train across it, in violation of state statutes and of the town ordinances.

(d) Failure to blow a whistle or ring a bell, in violation of the statute.

(e) Failure to place a fusee or flare.

(f) Failure to stop the train immediately after the collision.

(g) Failure to have, or to use, good brakes.

(h) Failure to so control the train operation as to prevent blocking of the highway.

(i) Failure to have crossbuck signs as required by statute.

(j) Insufficient crew.

(k) Allowing the train to stand practically motionless across the highway for an unreasonably long time.

(l) Failure to place lights in the highway or on the train to warn of its presence across the highway, in violation of the state statutes and the town ordinances.

(m) Failure to cut the train so as to clear the highway within a reasonable time as required by the statutes and the town ordinances.

The motion for directed verdict upon the ground now under discussion having been refused, the trial judge on appellant's motion struck from the specifications of negligence: all of the allegations of (g) and (m); so much of (a) as charged violation of the town ordinances; and so much of (c) and (l) as charged violation of state statutes and town ordinances.

Appellant's contention here rests upon a statement made by Mrs. Justice Fraser in *Osteen v. Atlantic Coast Line R. Co.,* 119 S. C. 438, 112 S. E. 352. That case was decided *en banc;* and the point here raised was not passed upon or discussed in the main opinion, which was written by Mr. Justice Cothran and concurred in by the other four justices and the ten circuit judges comprising the court. In his separate concurring opinion, in which he was joined by Circuit Judges Devore, McIver and Bowman, Mr. Justice Fraser pointed out that the complaint, after stating four specific acts of negligence, had alleged that in the absence of any one of them there would have been no accident; and he accordingly concluded that the trial judge should have charged the jury that it was incumbent upon the plaintiff to prove the existence of all of the said negligent acts so specified. Although the majority of the court did not express concurrence in it, that conclusion was probably correct in view of the unusual allegation of the complaint in that case, to which Mr. Justice Fraser referred. But it is not applicable here. In our opinion the trial judge properly construed the complaint in the instant case as entitling the plaintiff to base recovery upon proof of any one or more of the acts of negligence alleged. Code 1952, Section 10-679.

There was testimony to the effect that the decedent's annual earnings averaged $4,000, and that he was receiving a veteran's pension of $600 per year. At the time of his death he was fifty-six years old and had an expectancy of 17.10

years according to the mortuary table, Code, Section 26-12. One of the grounds of appellant's motion for a new trial was that respondent's counsel, using a blackboard in the course of his argument to the jury: (1) made calculations in which he used some figures not drawn from the testimony; and (2) multiplied by the figure 17 decedent's annual income before mentioned. The transcript of record does not specify what "figures not drawn from the testimony" were the subject of appellant's complaint. All that the transcript shows with reference to the use of the blackboard is the following, that took place during and immediately after counsel's closing argument to the jury: "Mr. Todd then objected to the use of a blackboard which was something that was not in the record and which he (Mr. Murdaugh) was then introducing in the record."

(Argument between counsel.)

"The Court: I think it is a pretty general idea to use the blackboard in connection with the argument to the jury."

(Argument completed.)

"Mr. Todd: If your Honor please, there is a question of law I would like to discuss with the court with reference to the use of the blackboard with figures on it. I don't know if I should do it at this particular stage in the presence of the jury.

"The Court: You gentlemen retire to your room a minute while I hear a matter of law."

(Note: The blackboard was taken out of the room after the jury went to their room and before they came back for the judge's charge.)

"Mr. Todd: A little while ago I made an objection to the use of the blackboard which may have been premature at that time. The point I wish to make is this: Some of the figures used on the blackboard were from the testimony and some others were not from the testimony, and therefore the combined figures were not evidence but purely argument and the jury should be instructed that they were merely for the purpose of argument and are not evidence in the case.

"The Court: I thought he used it purely as argument."

· (Further discussion between court and counsel as to instructions to the jury by the court as to how it should be considered.)

"The Court: I think it has become more ·or less court routine, and any matters that you think I should instruct the jury in it would help me if you would write down what you think I should say."

After further discussion as to the charge, the jury was brought back to the courtroom, and the trial judge proceeded to instruct them at considerable length, including in his charge all of the propositions, eleven in number, requested by the appellant. He made no reference to the use of the blackboard. He called the jury's attention to the undisputed fact that the decedent's age was fifty-six and his expectancy under the mortuary table seventeen and one-tenth years; and charged among other things, that if they should find that the plaintiff was entitled to a verdict for actual damages, it should include future or prospective, but not speculative or conjectural, damages to the beneficiaries of the action, and that "such future or prospective damages, if any, must be reduced to their present cash value."

At the close of his charge the trial judge, having excused the jury, said to counsel for both sides: "Gentlemen, is there anything else? Are there any exceptions or additions, or is there anything that I have omitted?" To this counsel on each side replied in the negative.

There is no impropriety in counsel's use of a black-board, during his argument to the jury, for the purpose of fairly illustrating points that are properly arguable. 53 Am. Jur., Trial, Section 490; 88 C. J. S., Trial, § 177; *Lauderdale County Cooperative v. Lansdell,* 263 Ala. 557, 83 So. (2d) 201; *Nehi Bottling Co. of Ellisville v. Jefferson,* 226 Miss. 586, 84 So. (2d) 684; Annotation: 44 A. L. R. (2d) 1205. Calculations made, or diagrams drawn, thereon are of course not evidence. Like statements of counsel

in oral argument, they should have reasonable foundation in the evidence or in inferences fairly arguable from the evidence. Just as oral argument may be abused, so may such visual argument; and its abuse may be so flagrant as to require a new trial. Control of the arguments of counsel, with regard to the use of such visual aids, as with regard to oral statements, rests in the sound discretion of the trial judge. *Johnson v. Life Insurance Co. of Georgia,* 227 S. C. 351, 88 S. E. (2d) 260, 55 A. L. R. (2d) 813; *Andrews v. Cardosa,* Fla. App., 97 So. (2d) 43; *Miller v. Loy,* 101 Ohio App. 405, 140 N. E. (2d) 38.

From the record before us, we gather that the position of appellant's counsel at the trial was not that opposing counsel's use of the blackboard was improper, but that the jury should have been instructed that the calculations made on it were to be considered merely as argumentative, and not as evidence. The record does not suggest that the trial judge disagreed with this view; on the contrary it appears that he asked counsel to put in writing what they wished him to say to the jury by way of instruction concerning the matter. That he failed to mention it in the course of his charge furnishes no basis for reversal. Counsel did not submit a request to charge as they had been invited to do, nor did they call the trial judge's attention to the omission at the close of his charge. Code 1952, Section 10-1210; *Munn v. Asseff,* 226 S. C. 54, 83 S. E. (2d) 642; *Tate v. Le Master,* 231 S. C. 429, 99 S. E. (2d) 39.

Like reasoning leads to dismissal of appellant's contention that the trial judge should have granted a new trial because he failed to charge the jury fully with regard to the provisions of the mortuary statute as to a decedent's health, constitution and habits. The statute (Code 1952, Section 26-12) declares that the expectancy table therein set forth shall be received as evidence, "along with other evidence as to his health, constitution and habits," of a person's life expectancy. The trial judge in his charge made no reference to the statute other than to state, as we have

mentioned, that decedent's age was fifty-six and his expectancy, according to the table, seventeen and one-tenth years. Appellant was given the opportunity to request amplification of the charge in that respect. Not having done so, it cannot now complain.

Appellant next contends that the trial judge erred in not granting its motion for a new trial upon the ground that one of respondent's counsel, in argument to the jury, said in substance that a human life was worth as much in Allendale County as in Hampton or Charleston County, and that an Allendale County jury should make awards in cases of wrongful death comparable to verdicts that had been rendered in such cases in the two counties last mentioned. We note that in respondent's brief it is stated that the counsel to whom this statement is attributed denies having made it and offered, at the hearing of the motion for new trial, to make an affidavit to that effect, which the trial judge declared would not be necessary. The arguments to the jury in the instant case were made on November 14, 1957. It is conceded that no objection to counsel's argument was made at that time, and that the alleged statement was not called to the trial judge's attention until August 2, 1958, when the motion for new trial was argued before him. It has been settled by many decisions of this court that, except in flagrant cases and where prejudice clearly appears, objection to improper argument of counsel should be made then and there, and comes too late if not made until after the verdict has been rendered. *Bunch v. Charleston & W. C. R. Co.,* 91 S. C. 139, 74 S. E. 363; *Jackson v. Enola Ginning Co.,* 139 S. C. 513, 138 S. E. 289; *Price v. American Agricultural Chemical Co.,* 178 S. C. 217, 182 S. E. 637; *Collins v. Atlantic Coast Line R. Co.,* 183 S. C. 284, 190 S. E. 817; *Bowers v. Charleston & W. C. Ry. Co.,* 210 S. C. 367, 42 S. E. (2d) 705. The reason for such a rule is obvious; its propriety is emphasized where counsel denies having made the improper statement attributed to him. We need not and do not consider whether the alleged statement before men-

tioned was such as would bring the instant case within the exception to the rule; to do so would first require determination of whether or not it was made—a factual issue which the trial judge did not undertake to resolve, and with which we have no concern.

The statutory beneficiaries of the cause of action here were the decedent's widow and his two children, a son and a daughter. The son, W. L. Herrington, was twenty-one years old at the time of his father's death in 1953. He had not lived with his parents since 1949, when he went into the army. After he had completed his military service, in 1952, he married and made his home in Pamplico, S. C., where he was living at the time of the accident. His sister had married about the year 1945, and in 1953 was living with her husband in Allentown, Pa. Appellant argues that a new trial should have been granted because "the verdict undoubtedly reflects a recovery of actual or pecuniary loss of the daughter and son, of which there is not a particle of testimony to support the same." This contention, not having been made before the trial judge, is not properly before us. *Simonds v. Simonds,* 229 S. C. 376, 93 S. E. (2d) 107.

Finally, appellant urges that the amount of the verdict was so grossly excessive as to indicate that it was the result of passion, prejudice and caprice. The decedent was fifty-six years old and, according to the evidence, in good health. As before mentioned, his expectancy was a little over seventeen years, and there was evidence that his annual income averaged about $4,600. His children were married and not dependent upon him for support; but the uncontradicted testimony was to the effect that the family relationship was close and affectionate, and it may reasonably be inferred that his death caused sorrow to his children as well as to his widow, and deprived them as well as her, though in lesser degree, of the benefit of his companionship and advice. Such intangible elements of damage are recoverable under our wrongful death statute; the difficulties attending realistic assessment of them, especially in an inflated economy, are

obvious. Cf. *Mock v. Atlantic Coast Line R. Co.*, 227 S. C. 245, 87 S. E. (2d) 830. The verdict now challenged was quite large, and the trial judge might well have reduced it for overgenerosity; but we cannot say from the record here that it was so shockingly excessive as to require the conclusion for which appellant contends.

Affirmed.

STUKES, C. J., and TAYLOR, OXNER and MOSS, JJ., concur.