Tina **MARTIN**, Administratrix of the Estate of Billie Carol Shreve, Deceased; and Donald Ray Shreve, Individually, Appellants,

v.

**OHIO COUNTY HOSPITAL CORPORATION,**
Appellee.

No. 2008–SC–000211–DG.

Supreme Court of Kentucky.

Oct. 1, 2009.

Abram V. Conway, II, Conway & Keown, Hartford, KY, Wanda McClure Dry, Oak Ridge, TN, Counsel for Appellants.

Ronald Sheffer, William Kenneth Burnham, Sheffer Law Firm, LLC, Louisville, KY, Counsel for Appellee.

Kevin Crosby Burke, Paul A. Casi, II, Paul A. Casi, PSC, Louisville, KY, Counsel for Amicus Curiae, Kentucky Justice Association.

Opinion of the Court by Justice NOBLE.

The Appellants in this action, Tina Martin, Administratrix of the Estate of Billie Carol Shreve, Deceased, and Donald Ray Shreve, Individually, were granted discretionary review of the Court of Appeals' reversal of the trial court's judgment. Two issues are raised: Whether a surviving spouse is entitled to loss of consortium damages beyond the death of the injured spouse for the unlawful acts of a third party; and whether the Appellee, Ohio County Hospital Corporation, was entitled to a directed verdict on a claim under the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd. This Court reverses the decision of the Court of Appeals.

## I. Background

The decedent in this action, Billie Carol Shreve, was injured in an automobile accident a short distance from the hospital run by Appellee, Ohio County Hospital Corporation. She was properly taken to the hospital's emergency room, and was first seen by a registered nurse who performed triage. The patient had indications of blunt abdominal trauma and stated that she was uncomfortable, and although she otherwise appeared stable at first, rapidly deteriorated. Her blood pressure began to drop severely and her pulse rate elevated approximately an hour and twenty-five minutes after arriving at the hospital, and she lapsed into unconsciousness some nine minutes later. The nurse and doctor attending her testified that by that time, they believed she had gone into shock, was probably hemorrhaging, and was in need of a surgeon. However, there was no surgeon available to the hospital, or one was not called. The attending physician could not pinpoint the source of bleeding, but ordered blood transfusions. This treatment gave rise to a negligence claim that is not before the Court. Despite no surgeon being available, the patient was not transferred to an appropriate facility at that time. Instead, the attending physician ordered a CT scan, but had to forward the films to another hospital to have a radiologist read them. It was over four hours later before the patient was transferred to another hospital. By the time she arrived, the patient had bled to death.

The medical negligence action against the physician was settled before trial, and the driver who caused the accident was never made a party. The trial court gave an instruction on loss of consortium damages that limited those damages to the

brief period from the time of the accident until Mrs. Shreve's death and to a total of $250,000. The jury awarded the maximum under this instruction.[1] Appellant Donald Ray Shreve offered a post-death loss of consortium instruction which the court declined, but he did not appeal this denial.

The trial court also gave an apportionment instruction on the fault of the driver, the doctor, and the hospital. The jury awarded no fault against the driver, 50% of fault against the doctor, and 50% against Appellee. On appeal, the Court of Appeals held that Appellee was entitled to a directed verdict both on the claim made by Appellant, Donald Ray Shreve, the spouse of the decedent, for loss of consortium, and on the claim made under the Emergency Medical Treatment and Active Labor Act, (EMTALA), 42 U.S.C. § 1395dd. This Court granted discretionary review.

## A. Loss of Consortium after Death

The issue of whether a spouse may claim loss of consortium after the death of her spouse turns on what the silence of the legislature on that issue in KRS 411.145 means.

At common law, loss of consortium was historically a one-way street. A husband could claim loss of consortium with his wife up until her death, but a wife could not claim the same loss with her husband. Then, in 1970, this Court's predecessor in *Kotsiris v. Ling*, 451 S.W.2d 411 (Ky.1970), expanded the cause of action for loss of consortium to allow a wife the same claim. That same year, KRS 411.145 was enacted, and states as follows:

> (1) As used in this section "consortium" means the right to the services, assistance, aid, society, companionship and conjugal relationship between husband and wife, or wife and husband.

> (2) Either a wife or husband may recover damages against a third person for loss of consortium, resulting from a negligent or wrongful act of such third person.

The statute defines "consortium" in such a way that it does not necessarily include financial support, but can be read to cover only the emotional and physical elements of a relationship between husband and wife such as love, companionship, and sexual relations. As such, it does not cause a double recovery through a wrongful death action claiming economic loss. Also, contrary to the common law up until *Kotsiris*, either a husband or wife may recover damages for this loss from a culpable third party. On its face, the statute gives equality for loss of consortium to both spouses, and codifies loss of consortium as a cause of action.

However, loss of consortium developed as a common law concept, and under common law it terminated with the death of the spouse. The reasoning was that death terminated any possibility of a spousal relationship, and thus all loss would be covered by a wrongful death action. *See generally* Thomas Cooley, *A Treatise on the Law of Torts* 470 (3d ed.1906). Grounded initially on the loss of sexual congress, the common law doctrine evolved to include the "softer" aspects of a relationship, and finally, in *Kotsiris*, an equal claim for either spouse.

But with the enactment of the statute, the General Assembly made loss of consortium a statutory cause of action, which belongs specifically to a spouse, not to the

---

1. The instruction stated that the jury could award money damages for the "[l]oss of Plaintiff, Donald Ray Shreve, of the services, assistance, aid, society, companionship, and conjugal relationship of his wife, not to exceed $250,000.00. Any recovery for loss of consortium ended with the death of M[r]s. Shreve."

estate of the deceased. The statute is silent as to whether such a claim is limited to the loss up until the spouse's death or extends beyond it. At common law, as noted above, loss of consortium claims ended at death. An argument can be made that the legislature intended to codify the cause of action of loss of consortium as it existed at common law, and thus the silence must be interpreted to mean that the claim still ends at death. But an equally viable argument can be made that if legislators had so intended, they would have said so. Instead, the statutory language is a broad grant without stated limitations of any kind, subject only to the general principles of tort law and the procedural rulings of the courts.

Thus the Court is left to construe the statute until the legislature clarifies its meaning by amending the statute or enacts a different statute.

Appellant argues that spouses have a loss of consortium claim extending beyond the death of their spouse because this Court extended such a right to children in *Giuliani v. Guiler*, 951 S.W.2d 318 (Ky. 1997). Finding that "[t]he claim of loss of parental consortium is a reciprocal of the claim of the parents for loss of a child's consortium which was recognized in KRS 411.135," *id.* at 321, this Court determined that recognizing a parent's right to loss of love and affection of a child and not allowing the converse for the child ran counter to public policy which favors strengthening family bonds. It is interesting to note that the statute limits the parents' recovery to the time it would have taken a child to reach majority, but this Court did not specify such a restriction on the child's claim for loss of consortium. The opinion is completely silent as to the duration of the damages. In other ways, however, this case is significantly different from *Guiler*.

First, there is a statute which gives spouses a claim for loss of consortium. To date, there is still no statute which gives children a right to parental loss of consortium damages. Contra, KRS 411.135 gives parents damages for loss of consortium with the child. That statute, which this Court in *Guiler* termed as "reciprocal" to a child's loss of parental consortium claim, does not appear to create a separate cause of action, but instead begins, "In a wrongful death action in which the decedent was a minor child," and goes on to say that the loss of affection and companionship is an element of damages to be recovered "in addition to all other elements of the damages usually recoverable in a wrongful death action." This appears to be an additional element of damages within the wrongful death statute, not a separate cause of action for loss of consortium. Nevertheless, this Court has held that the parents of a deceased child do have a claim under this statute for the loss of affection and companionship of their child regardless of whether the personal representative of the child's estate ever asserts a claim for wrongful death. *Dep't of Educ. v. Blevins*, 707 S.W.2d 782, 785 (Ky.1986). That opinion followed the *Guiler* decision, and is consistent with the notion that loss of consortium is a personal rather than an estate right. The statutes do not give children such a personal claim; that was done by the Court in *Guiler*.

■ KRS 411.145, which was enacted in 1970, the same year the Court issued its opinion in *Kotsiris*, says that a wife or a husband "may recover damages against a third person for loss of consortium" resulting from a negligent or intentional act, clearly establishing a separate cause of action for spousal loss of consortium. Such a recovery is not premised on the spouse's death, so it is not specifically a part of a wrongful death claim under Ken-

tucky law. Loss of consortium damages can be obtained whenever a spouse is wrongfully incapacitated by a third party to the extent that the marital relationship has been damaged due to that harm. A loss of consortium action can continue even when the injured spouse or the estate has settled or otherwise been excluded from an action, because there is not a "common and undivided interest" in the spouse's claim for loss of consortium and the underlying tort claim. *Poplar v. KKI, LLC,* 2005 WL 2739158 (W.D.Ky.2005) (unpublished decision); *see also Blevins,* 707 S.W.2d at 783. Thus, because the legislature has spoken on this subject, this is not a matter of the Court declaring the common law as it did in *Guiler.*

■ But just as the Court did not address whether loss of parental consortium continues after the age of majority in *Guiler,* the legislature has not addressed specifically in the statute whether loss of consortium damages continue after the death of the spouse in KRS 411.145. This question was not at issue in *Guiler,* but is the controlling question here. Thus this Court must answer that question, and does so by saying that loss of consortium damages under KRS 411.145 do not cease at death.

The Court reaches this conclusion by first looking at the language of the statute: "a wife or a husband may recover damages." Those damages, as enumerated in subsection (1), encompass "services, assistance, aid, society, companionship and conjugal relationship...." KRS 411.145(1). When this loss results from a "negligent or wrongful act" of a third person, the legislative intent is clear that this person must compensate the spouse for the loss. The general focus of this statute is compensatory in nature.

The courts have been exhorted that "common sense must not be a stranger in the house of the law." *Cantrell v. Ken-*

*tucky Unemployment Ins. Comm'n,* 450 S.W.2d 235, 237 (Ky.1970). It is apparent that the kinds of damage elements enumerated in the statute are those that describe the personal relationship, mental and physical, between spouses. It is equally apparent that the pain and deprivation coming from loss of such interactions does not magically disappear the day a spouse dies. It defies common sense to put a value on such losses while a spouse is lying incapacitated, but to say the loss is worthless after death. While grief and loss are borne in different ways by different people, it is nonetheless a common part of the human condition that a jury can properly evaluate based on the facts and circumstances of each case.

Further, since the statute is intended to be compensatory, full compensation cannot be had if the damages claimed are required to terminate at death. Indeed, in many cases death is so sudden or follows so quickly after the injury that to cut loss of consortium damages off at death is to essentially deny the cause of action to the spouse altogether. In creating the cause of action, the legislature did not indicate in the statute that it applied only when the victims survived. To read the statute that way would be to create a class of plaintiffs whose cause of action depended on the vagaries of fate, rather than an orderly operation of law. Can it reasonably be said that one whose spouse survives suffers more loss of consortium than one whose spouse dies?

Moreover, allowing a loss of consortium claim only if the victim survives would appear to give perverse incentives to potential tortfeasors. Such a rule could create incentives to kill victims instead of leaving them disabled, as only by instantly killing the victim can the tortfeasor be guaranteed to owe no loss of consortium

damages. While this logically follows the common law rule, it is obviously absurd.

Twenty-six other states have some form of loss of spousal consortium set forth in a statute,[2] as Kentucky has done, although Kentucky appears to be unique in that our statute does not address whether such damages terminate or continue at death. All of these other states specifically recognize that the types of damages set forth in KRS 411.145 continue after death, usually by including them as elements of damage in their wrongful death statutes. Some states, such as Iowa, include the damages in the wrongful death action, and require that the claim be made by the personal representative of the estate, but on behalf of the spouse who lost consortium. Regardless of the mechanism used, all these states allow post-death claims. Our statute, which makes loss of consortium a personal right which can be claimed directly by the spouse, is in line with the recognition by these other states that the claim is separate from the claim for the injuries to the deceased spouse. It is reasonable to construe our statute as also intending to allow post-death loss of consortium, since there is no express limit on those damages.

For the states that do not expressly include loss of consortium in their wrongful death statutes, fifteen recognize through their case law that loss of consortium damages continue past death,[3] while only seven stop them at the death of the spouse,[4] which is what Kentucky's common law did. *See Rogers v. Fancy Farm Telephone Co.*, 160 Ky. 841, 170 S.W. 178, 179 (1914). The fact that our legislature deemed it necessary to enact a statute

**2.** Alaska Stat. § 09.55.580(c) (2003); Ark. Code Ann. § 16–62–102(f)(1) (2006); Colo. Rev.Stat. § 13–21–203(1)(a) (2005); Conn. Gen.Stat. § 52–555a to –555b (2005); Fla. Stat. § 768.21(2) (2003); Haw.Rev.Stat. § 663–3(b)(1)–(2) (2009); Ind.Code. § 34–23–1–2(c)(3)(B) (1999); Kan. Stat. Ann. § 60–1904(a)(2)–(3) (2008); La. Civ.Code Ann. Art. 2315(B) (2001); Me.Rev.Stat. Ann. tit. 18–A, § 2–804(b), amended by 2009 Me. Legis. Serv. 180 (West); Md.Code Ann., Cts. & Jud. Proc. § 3–904(d) (West 2006); Mass. Gen. Laws ch. 229, § 2 (2000); Mich. Comp. Laws § 600.2922(6) (2005 & Supp.2007); Mo.Rev. Stat. § 537.090 (2000); Mont.Code. Ann. § 27–1–307(3)(b)(iii) (2008); Nev.Rev.Stat. § 41.085(4) (2008); N.C. Gen.Stat. § 28A–18–2(b)(4)(b)–(c) (2006); N.D. Cent.Code § 32–03.2–04(2) (2008); Ohio Rev.Code Ann. § 2125.02(B)(3) (West 2009); Okla. Stat. tit. 12, § 1053(B) (2000 & Supp.2009); Or.Rev. Stat. § 30.020(2)(d) (2003); R.I. Gen. Laws § 10–7–2 (2008); Va.Code Ann. § 8.01–52(1) (2009); W. Va.Code § 55–7–6(c)(1)(A) (2009); Wis. Stat. § 895.04(4) (2006); Wyo. Stat. Ann. § 1–38–102(c) (2009).

**3.** *Boies v. Cole*, 99 Ariz. 198, 407 P.2d 917, 920 (1965); *Krouse v. Graham*, 19 Cal.3d 59, 137 Cal.Rptr. 863, 562 P.2d 1022, 1027 (1977); *Horner v. Sani–Top, Inc.*, 143 Idaho 230, 141 P.3d 1099, 1106 (2006); *Kubian v.*

*Alexian Bros. Med. Ctr.*, 272 Ill.App.3d 246, 209 Ill.Dec. 303, 651 N.E.2d 231, 233 (1995); *Madison v. Colby*, 348 N.W.2d 202, 209 (Iowa 1984); *McGowan v. Estate of Wright*, 524 So.2d 308, 311 (Miss.1988); *Selders v. Armentrout*, 190 Neb. 275, 207 N.W.2d 686, 689 (1973); *Romero v. Byers*, 117 N.M. 422, 872 P.2d 840, 842–43 (1994); *Pennsylvania R.R. Co. v. Goodman*, 62 Pa. 329, 1869 WL 7272, at *8 (1869); *Johnson v. Charleston & W.C. Ry. Co.*, 234 S.C. 448, 108 S.E.2d 777, 787 (1959); *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 598 (Tenn.1999); *Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630, 635–36 (Tex.1986); *Jones v. Carvell*, 641 P.2d 105, 107–08 (Utah 1982); *Mears v. Colvin*, 171 Vt. 655, 768 A.2d 1264, 1267 (2000); *Walker v. McNeill*, 17 Wash. 582, 50 P. 518, 519, 521–22 (1897).

**4.** *Zimmerman v. Lloyd Noland Found., Inc.*, 582 So.2d 548, 551 (Ala.1991); *Reynolds v. Willis*, 209 A.2d 760, 762 (Del.1965); *T & M Invs., Inc. v. Jackson*, 206 Ga.App. 218, 425 S.E.2d 300, 304 (1992); *Archie v. Hampton*, 112 N.H. 13, 287 A.2d 622, 625 (1972); *Liff v. Schildkrout*, 49 N.Y.2d 622, 427 N.Y.S.2d 746, 404 N.E.2d 1288, 1291 (1980); *Thalman v. Owens–Corning Fiberglas Corp.*, 290 N.J.Super. 676, 676 A.2d 611, 614 (1996); *Zoss v. Dakota Truck Underwriters*, 590 N.W.2d 911, 914 (S.D.1999).

creating this cause of action instead of leaving it to the common law demonstrates that it wished to depart from the common law approach to loss of consortium, since the enacted statute supersedes the common law. The legislature took the common law claim for loss of consortium, expanded it to include women, and defined the elements of the damages. It did not include the limiting language of "until death," when it could easily have done so when listing any or all of the elements of damages. Instead, it used the broad compensatory language "may recover damages." While an argument can be made that the broad language of the statute is equally amenable to the construction that the legislature intended to adopt the claim as it then existed, it would have said so if that were the intention. Otherwise, there was no need for the legislature to act at all.

The Appellee has argued that the statutory definition of "marriage" in KRS 402.005 precludes recovery for spousal consortium after death because marriage is defined as a man and a woman being united "for life." Consequently, they argue, marriage ends at death and thus spousal consortium must end at death. If the Court were looking at the question of the legal effect of marriage laws after death, this might have more merit. However, a loss of consortium claim is grounded on compensation for a third party's wrong-doing which intervenes in the marital relationship so as to deny spousal consortium. It provides liability for wrongfully depriving or cutting short the marital relationship. This claim is not about whether a marriage has ended, but rather about whether the marital relationship could have continued but for the wrongdoing of the third party. The loss that comes from wrongly depriving a spouse of her relationship with her husband, or vice versa, is definable and measurable. It has little to do with the legal construct of marriage at death, but everything to do with the relationship that was wrongly taken away from the surviving spouse.

At the crux of this claim is compensation for loss of the most compelling of human relationships, other than possibly that of parent and child. Our legislature did not intend, nor does this Court, to devalue that relationship by putting an arbitrary limit on the duration of what can be profound loss. Our statute permits that loss to be evaluated by a jury, and therefore it is the right of bereaved spouses to have such an evaluation. Thus, this Court reads KRS 411.145 as allowing post-death loss of consortium claims. To the extent that *Clark v. Hauck Manufacturing Co.*, 910 S.W.2d 247 (Ky.1995), and *Brooks v. Burkeen*, 549 S.W.2d 91 (Ky.1977), neither of which cited KRS 411.145, hold otherwise, or can be read to do so, they are overruled.

The Court of Appeals is therefore reversed on this issue. Because of some unusual procedural elements of this appeal, however, there is some question as to the effect of that reversal. The Court of Appeals held that the Appellee, who was the defendant at trial, was entitled to a directed verdict because Mrs. Shreve had not lived long enough to allow for a loss of consortium claim, since such a claim terminated at her death. This Court is reversing because it reads KRS 411.145 as allowing such claims and damages to extend beyond death, meaning that a directed verdict on that ground would not be proper. However, this also means that the loss of consortium instruction given by the trial court was erroneous, as it limited damages to those during Mrs. Shreve's life. But the Appellants (the plaintiffs at trial) did not appeal the trial court's erroneous instruction, which had the effect "to deny [them] something for which [they have] asked," *Brown v. Barkley*, 628 S.W.2d 616,

619 (Ky.1982), and which therefore prevents the Appellants from undoing the trial court's judgment. Thus, despite the erroneous instruction, this Court cannot require a retrial on damages under an appropriate instruction. Nor can this Court engage in the sort of review requested by the Appellee at the Court of Appeals (i.e., review the sufficiency of the evidence of the loss of consortium damages) because the Appellee did not file a protective cross-motion for discretionary review on that issue with this Court, and the Court of Appeals did decide it, ruling that *no* claim for loss of consortium could lie because of the short time that Mrs. Shreve lived.

The only option is to reinstate the judgment of the trial court on this issue, since this Court has concluded that the Court of Appeals improperly reversed it. This is so despite the fact that an instructional error underlies the trial court's judgment and arguably worked against the Appellants, since their damages were more limited than this Court reads the law as allowing. Reinstating that judgment, however, is not unjust, because it appears that even with the flawed instruction, the Appellants received the maximum damages they requested (and to which they were limited, that being the amount listed in the interrogatories). Because the Appellants did not appeal the denial of a post-death loss of consortium instruction, a reinstatement of the judgment as to loss of consortium damages would amount to giving them all they asked for originally. Moreover, it is not improper to reinstate the trial judgment on a ground not cross-appealed by the Appellants to this Court because this Court would in effect be affirming the trial court but for different reasons, which is acceptable even when there has been no cross-appeal. *See Carrico v. City of Owensboro,* 511 S.W.2d 677, 679 (Ky.1974).

## B. EMTALA Claim

■ The Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, enacted by Congress in 1986, is sometimes referred to as an "anti-dumping" statute because its primary purpose is to prevent hospitals from "dumping" patients who lack insurance or cannot pay for their claims, through refusing treatment or referring them to other hospitals. *Thornton v. Sw. Detroit Hosp.,* 895 F.2d 1131 (6th Cir.1990). The claim here is not that Appellee refused treatment at its hospital because the patient could not pay, but that treatment was wrongfully delayed, leading to the patient's death. The facts, on their face, are not a neat fit with EMTALA. In fact, the EMTALA claim in this action is little more than a restatement of the malpractice claim against the physician: that he wrongfully screened, tested, and treated the patient. The intent of the statute is to ensure that a physician does not shirk screening an indigent person or transfer that person to another hospital to avoid treating him because he cannot pay, not to create a federal malpractice cause of action. *Nolen v. Boca Raton Cmty. Hosp., Inc.,* 373 F.3d 1151 (11th Cir.2004).

Thus, it is arguable that EMTALA does not apply here because there is no record that any actions taken by the hospital were based on the patient's inability to pay; the patient was indeed given many services. Their efficacy may be questioned as a medical malpractice claim, but not the fact that they were not given. However, assuming that EMTALA does apply here, and because this issue is capable of repetition, it contains a screening requirement, § 1395dd(a), and a stabilization or transfer requirement, § 1395dd(b), and allows a private cause of action directly against hospitals for violation of the duties created by the statute, § 1395dd(d)(2).

The screening requirement provides that, if a hospital at which an individual seeks "examination or treatment" has an emergency room, the hospital *must* provide "an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department...." The purpose of providing such screening is "to determine whether or not an emergency medical condition ... exists." § 1395dd(a). The hospital must do enough screening or diagnostics to make that determination. If there is no emergency, this Act does not apply. If the hospital determines that an emergency medical condition exists, then the stabilization-or-transfer requirement kicks in. This requires the hospital to provide additional medical examination and treatment within its capabilities or to transfer the person to an appropriate facility. In reality, the medical emergency may require some treatment, if within the hospital's capability, before transfer, which is arguably what happened here.

However, subsection (c) of EMTALA places three alternative requirements on the hospital, only one of which must be met, before it may transfer a patient: that it get a request to transfer in writing from the patient; that a physician sign a certification that the treatment reasonably expected to be received at the other hospital outweighs the risks of transfer; and that if no physician is physically present, qualified medical personnel as defined in the statute may sign the risk certification if a physician has in fact made the determination and later adopts it by signing it. § 1395dd(c).

These facts are not in dispute: the hospital recognized that a medical emergency existed at least when the patient lost consciousness, if not before (based on the triage nurse's claim that she was suspicious of a serious injury and thought surgery would be necessary once Mrs. Shreve's blood pressure dropped and pulse elevated); at some point during the four or so hours the patient was at the hospital, the hospital recognized that the surgeon who was on call was not available; during that wait, the hospital undertook treatment by transfusing the patient to counter her blood loss, and continued further attempts to determine the source of the bleeding, including having a CT scan done; when that was unsuccessful, the physician began the process of transferring the patient to another hospital, and completed and signed the Certificate of Transfer as required by the statute.

While questions may abound as to whether the physician and hospital staff performed all these events within the appropriate standard of care, those questions are not covered by this statute. By its terms, this is a strict liability statute: it asserts what a hospital *must* do, and creates liability for any failure. If a hospital does not follow the requirements of the statute, it is liable. Any personal harm to an individual will result in damages for personal injury under local state law if caused by the violation, and will result in a fine of up to $50,000 if the violation is negligent, or gross and flagrant, or repeated, and the hospital may also lose its licensing. § 1395dd(d). On the other hand, if the hospital has complied with the statute's requirements, it is not material under the statute how well it did them—that is a different cause of action, likely for negligence. The Appellee was entitled to a directed verdict on the EMTALA issues of screening and stabilization or transfer because all the requirements of the statute were met.

This Court does not believe that improper motive is an element of the individual EMTALA claim. If a hospital complies

with the statute, motive is obviously immaterial. But it is also immaterial when it does not comply, because regardless of motive, the hospital has failed in its statutory duty, and is thus liable. If there is no dispute that the hospital did or did not do what the statute requires, then the personal cause of action is to determine damages only. But this Court does recognize that there could be a dispute over whether the hospital has done the necessary things, such as a scenario where a physician testifies that he completed and signed the Certificate of Transfer, but it cannot now be found in the record. Such questions of fact would also obviously be determined at trial.

■ To that end, a general negligence instruction is not appropriate in an EMTALA claim. The statute puts an absolute duty on hospitals to do what it requires. Thus, appropriate instructions (if there is a liability question, and assuming that the hospital has an emergency department) would be as follows.

If an emergency medical condition has not been determined, such as when a patient is allegedly improperly screened:

It was the duty of defendant hospital to provide an appropriate medical screening examination of the plaintiff (decedent) within the capability of the hospital's emergency department whether or not a medical emergency exists.

Do you believe, based on the evidence, that the hospital provided such screening?

Yes —— No ——

For instance, this instruction would apply when a patient was released without further examination, stabilization or transfer on a determination that there was no emergency medical condition, then later has problems or dies.

If the hospital has determined that the individual has an emergency medical condition:

It was the duty of the hospital, because there was an emergency medical condition, to

A) provide such medical examination and treatment necessary to stabilize the medical condition within the staff and facilities available; or

B) to transfer the plaintiff (decedent) to another medical facility by

1) obtaining informed consent from the plaintiff (decedent) in writing; or

2) issuing and signing a Certificate of Transfer certifying that the medical benefits reasonably expected from the transfer outweigh any increased risks to the individual from transfer; or

3) allowing a qualified medical person to issue the Certificate of Transfer after a physician has made the actual certification, and subsequently signs the certificate.

Do you believe, based on the evidence, that the hospital performed its duty in regard to the plaintiff (decedent)?

Yes —— No ——

This instruction should be given if a determination that there is an emergency medical condition has been made. After such determination, the screening requirements obviously have no application because regardless of their efficacy, the proper determination has been made that requires further examination and treatment within the hospital's capabilities, or transfer to an appropriate facility.

■ There will be necessary variations depending on the facts of each case, and whether there is a liability question or a damages claim only. Since the damages allowed to the individual by the statute are those "available for personal injury under

the law of the State in which the hospital is located," § 1395dd(d)(2)(A), the general damages instruction will apply. But it must be emphasized that such damages are available under EMTALA only when the personal harm is a direct result of the hospital's violation of the statute, not by any harm caused by the medical negligence of personnel or the hospital.

■ Despite the above analysis, the fact that the trial court did not give a directed verdict on the EMTALA claim is not grounds for reversal of the jury verdict or judgment in this case. The Court of Appeals reached the same conclusion about the necessity of a directed verdict, but held that a new trial on damages would be required under *Stringer v. Wal–Mart Stores, Inc.*, 151 S.W.3d 781, 801 (Ky.2004). In Stringer, the plaintiffs raised three claims—intentional infliction of emotional distress, defamation, and invasion of privacy—that had overlapping but not completely coterminous injuries. Thus, because the defendants were entitled to directed verdicts on two of the three claims, this Court vacated the damages award and ordered a retrial on damages only as to the remaining claim.

In making the wrongful death claim in this case, the Appellants alleged multiple tortious acts, and the trial court eventually instructed on three theories against the hospital based on those alleged acts: a policy and procedures claim, a general medical negligence claim, and the EMTALA claim. Regardless of the route taken to liability, the injury under all three claims was the same—the death of Mrs. Shreve. Likewise, the proof of damages was the same for all three theories, including the claim under EMTALA, which allows state personal injury damages under 42 U.S.C. § 1395dd(d)(2). The jury found liability under all three theories, two of which were not appealed to this Court.

Because the injury and damages under those theories of liability were the same as under the EMTALA claim, this case is distinguishable from *Stringer*. *Stringer* involved three separate torts, with overlapping but ultimately different injuries. But the Appellants in this case pleaded alternative theories of liability for a single injury—wrongful death. The jury had to find causation in order to find liability, and here the jury found liability under all three theories. This amounted to a finding that any of the three tortious acts was a sufficient cause of the wrongful death, and the damages that flowed from that injury.

As to the loss of consortium, the directed verdict on the EMTALA statute also has no effect because wrongful death could be established by either of the two theories that were not appealed, and the finding of the wrongful death of Mrs. Shreve was an element of proof of the loss of consortium claim. Either of the surviving findings of liability is sufficient to support the loss of consortium damages award.

Therefore, this Court concludes that while the failure to give a directed verdict on the EMTALA claim in this case was error, it was harmless as to the damages award returned by the jury under the policy and procedures claim or the general negligence claim, which were not appealed.

### III. Conclusion

Kentucky's loss of consortium statute, KRS 411.145, is compensatory in nature, and creates an independent cause of action for the spouse of an injured or deceased person. The statute is silent as to the duration of any damages from the loss, and this Court will not provide a term that is missing by limiting recovery only up to the time of death. On this ground, the Court of Appeals is reversed, and the judgment of the trial court is reinstated on the loss of consortium claim.

The Appellee hospital in this case was entitled to a directed verdict on the EMTALA claim because there is no dispute that it performed the required elements of the statute which is designed to prevent hospitals from "dumping" patients who cannot pay for their care. The statute imposes absolute liability on a hospital if it fails in conforming to the statute, but there is no liability if it has, which is the case here. However, because the jury verdict found liability for wrongful death on all three theories of causation, this error is harmless because the damages claimed and proven were for the same personal injury. Thus the Court of Appeals is affirmed to the extent it held that a directed verdict was required but its judgment is reversed on this ground because the verdict of the jury and judgment of the trial court are otherwise sustainable.

For the forgoing reasons, the decision of the Court of Appeals is reversed and the judgment of the Ohio Circuit Court is reinstated in its entirety.

All sitting. All concur.