**Wesley GILLIAM, Appellant,**

v.

**PIKEVILLE UNITED METHODIST HOSPITAL OF KENTUCKY, INC.;** and Danny Briscoe, Appellees.

No. 2004–CA–001573–MR.

Court of Appeals of Kentucky.

Feb. 17, 2006.

Rehearing Denied July 31, 2006.

Discretionary Review Denied by Supreme Court March 14, 2007.

Lawrence R. Webster, Pikeville, KY, for appellant.

Joshua J. Owen, Pamela R. May, Pikeville, KY, for appellee Pikeville United Methodist Hospital Of Kentucky, Inc.

Richard S. Cleary, P. Blaine Grant, Louisville, KY, for appellee Danny Briscoe.

Before TAYLOR and VANMETER, Judges; POTTER, Senior Judge.[1]

1. Senior Judge John Woods Potter sitting as Special Judge by assignment of the Chief Jus-

## OPINION

VANMETER, Judge.

Wesley Gilliam appeals from an order of the Pike Circuit Court granting summary judgment to Pikeville United Methodist Hospital of Kentucky, Inc. (Hospital) and Danny Briscoe. The court dismissed Gilliam's complaint, which alleged that appellees made defamatory statements about him and breached a contractual duty of confidentiality by causing his personnel and employment records to be made public and cast in a false light. Because Gilliam cannot establish damages in connection with the defamatory statements, we affirm.

In 1993 or 1994, Gilliam became employed as a Radiology Aide at the Hospital. In August 1998 the Hospital's registered nurses and nonprofessional employees voted to be represented by the United Steelworkers of America (Union). The National Labor Relations Board subsequently certified the Union as a bargaining representative for the unionized employees, including Gilliam. Eventually, Gilliam became one of five Hospital employees who served on the local contract negotiating committee for the nonprofessional employees.

Meanwhile, the Hospital's tardiness policy was suspended because a hospital construction project caused employees to have difficulty in finding parking spaces and getting to work on time. According to Gilliam, during this time his start time was modified and was "flexible." In July 2000, as the construction project neared completion, the Hospital began considering the establishment of a new clock-in policy and the reinstatement of a policy which would make employee tardiness a disciplinary offense.

During a July 7, 2000, negotiating session with the Union's negotiating committee, the Hospital's negotiating team raised the issue of reinstating a tardiness policy, and the Hospital's counsel accused Gilliam of being habitually tardy. Gilliam, who considered counsel's tone as degrading, denied the allegations at the meeting, and subsequently told the Hospital's representatives that he had not been habitually tardy.

Several days later, on July 11, 2000, a flyer entitled "New Clocking Policy" was anonymously posted on the Hospital's employee bulletin boards. The flyer stated as follows:

### NEW CLOCKING POLICY

The following is the new policy that the Hospital is going to implement sometime later this year according to Juanita Deskins, Pam May, Debbie Puckett and Jim Smith.

Employees will now clock in and out for all breaks and lunches as well as the beginning and end of each shift. This will be a total of *8* times a day.

1. Clock in for the beginning of shift.
2. Clock out for 10 minute morning break ... You must enter a code as well.
3. Clock in from morning break ... You must enter a different code.
4. Clock out for lunch ... You must enter a code (different from break codes).
5. Clock in from lunch ... You must enter a different code.
6. Clock out for 10 minute evening break ... Don't forget correct code.
7. Clock in from evening break ... Enter correct code.
8. Clock out to go home.

tice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

If you foresee any potential problems or confusion with this new policy please inform your manager.

Presuming that the Union was responsible for the flyer, the Hospital requested a response be prepared by Danny Briscoe, a consultant and public relations specialist hired by the Hospital in connection with the union drive. The resulting newsletter style flyer, which eventually gave rise to this defamation lawsuit against Briscoe and the Hospital, stated as follows:

### THE COLD HARD TRUTH

Dedicated to keeping you informed

Volume 1, Issue 1 July 2000

Let me set the record straight. Some of the employees at Pikeville Methodist Hospital have been regularly coming to work late. On Friday, July 7, 2000, there was a negotiation session between the Steelworkers and the Hospital. At that session, an attorney for the Hospital presented the following information to the Steelworkers:

1. An employee of the Hospital, who is a member of the Steelworkers' negotiating committee, had a serious problem with coming to work on time.

2. Our attorney pointed out that this employee had been late for work every day for three consecutive weeks.

3. This same employee was three hours and four minutes late for work during one seven-day work period.

This kind of abuse must be stopped. It is not fair to all of the hard working people at this Hospital that arrive on time every day. This abuse often requires employees to work beyond their shift to cover for the person that is late.

The employees who are arriving late for work seem to be arriving late on a regular basis.

The managers and directors have been asked to monitor this situation to determine how many employees are tardy on a regular basis. That is all that has been done.

On Tuesday, July 11, 2000, a memo was handed out and posted on several bulletin boards. We have been told that this was done by union sympathizers. This memo accused the Hospital of beginning a policy of clocking in and out for breaks, lunch, etc. **That memo is a lie.** The memo was written to scare, frighten, intimidate, and confuse the employees. If you saw this memo you know it was unsigned and on blank stationary. You would think a member of the union's negotiating team would try to set a good example. However, this particular employee apparently believed the rules did not apply. Obviously, we embarrassed this employee by pointing out the employee's chronic tardiness problem, specifically being tardy three hours and four minutes over a seven-day work period. The point is, that rules apply equally to everyone. It is just not fair to our employees who come to work on time to let others wander in whenever they please.

So, from now on, when you hear rumors, when you hear gossip, or you receive unsigned false memos, remember, maybe somebody is just mad and trying to cause trouble.

Danny Briscoe
*Director of Public Relations*

Briscoe prepared the flyer based on information provided by Hospital personnel,[2]

---

**2.** In Briscoe's deposition, he was unable to identify specifically who provided him with the facts, but said it was one of the hospital's negotiating committee: Pam May, Jim Smith, Juanita Deskins, and Debbie Puckett.

including a list of the dates and times when several employees were tardy or absent from work. The flyer was printed and distributed after it was reviewed by Hospital counsel. Although the flyer did not specifically name the habitually tardy employee, Gilliam construed the flyer as referring to him. Briscoe later confirmed that assumption in his deposition testimony.

On December 7, 2000, Gilliam filed a complaint in Pike Circuit Court naming Briscoe and the Hospital as defendants. Among other claims, the complaint alleged that the Hospital's flyer was defamatory and false in suggesting that Gilliam "had abused other employees by chronic tardiness." In due course,[3] the defendants moved for summary judgment. On July 21, 2004, without identifying its rationale, the circuit court granted the motion and dismissed Gilliam's complaint. This appeal followed.

Summary judgment is proper only "where the movant shows that the adverse party could not prevail under any circumstances."[4] The trial court must view the record "in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor."[5] However, "a party opposing a properly supported summary judgment motion cannot defeat that motion without presenting at least some affirmative evidence demonstrating that there is a genuine issue of material fact requiring trial."[6] This Court has previously stated that

[t]he standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law. There is no requirement that the appellate court defer to the trial court since factual findings are not at issue.[7]

 The four elements which must be proven to establish a defamation action in Kentucky include defamatory language, about the plaintiff, which is published and which causes injury to reputation.[8] Because the particular defamation claim now before us occurred in the context of a labor dispute, Gilliam must also prove a fifth element of "actual malice"[9] as defined in

3. After the complaint was filed in Pike Circuit Court, the defendants removed the case to the United States District Court for the Eastern District of Kentucky, Pikeville Division, because the defendants believed that one or more of Gilliam's claims was governed by Federal labor law. The District Court remanded the case back to Pike Circuit Court on the basis that it did not have subject-matter jurisdiction. The District Court determined that while the National Labor Relations Act (NLRA) partially preempted the defamation claim because the allegedly defamatory statements were made in the context of a labor-management dispute, Gilliam was nevertheless entitled to pursue his defamation claim in state court subject to the enhanced standard as set forth in *Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966).

4. *Steelvest, Inc. v. Scansteel Service Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky.1991) (citing *Paints-*

*ville Hosp. Co. v. Rose*, 683 S.W.2d 255 (Ky. 1985)).

5. *Steelvest*, 807 S.W.2d at 480 (citing *Dossett v. New York Mining & Mfg. Co.*, 451 S.W.2d 843 (Ky.1970)).

6. *Hubble v. Johnson*, 841 S.W.2d 169, 171 (Ky.1992)(citing *Steelvest*, 807 S.W.2d at 480).

7. *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App.1996).

8. *Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 273 (Ky.App.1981).

9. *Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966).

*New York Times Co. v. Sullivan*[10] and its progeny. Although the parties devote considerable effort to addressing each of these elements, our resolution of this matter turns on Gilliam's failure to prove injury to his reputation and related damages.

As stated by our highest court in *Hill v. Evans*,[11] "[g]enerally, defamatory words written or spoken of another are divided into two classes in determining the extent to which they are actionable. Words may be actionable per se, or per quod."[12] If words are defamatory per se, damages are presumed and the plaintiff may recover without alleging or proving special damages.[13] Statements classified as defamatory per se include those which attribute to someone a criminal offense, a loathsome disease, serious sexual misconduct, or conduct which is incompatible with his business, trade, profession, or office.[14] Words may be actionable per quod, by contrast, only if there is an allegation and proof of actual damages.[15]

Here, because the statements in question allege the conduct of habitual tardiness, which is incompatible with the employee's trade or profession, these statements would be defamatory per se in the normal defamation case under state law. However, because the statements occurred in the context of a labor dispute, Gilliam must prove damages, "which may include general injury to reputation, consequent mental suffering, alienation of associates, specific items of pecuniary loss, or whatev-

er form of harm would be recognized by state tort law."[16] In explicitly requiring proof of harm, federal case law preempts not only non-malicious instances of libel, but also reliance on the common law presumption of damages in those jurisdictions where libel is actionable per se.[17] Therefore, a plaintiff who endures even malicious libel during a labor dispute must present evidence of harm from defamation in order to recover, notwithstanding the fact that damages might otherwise be presumed under state law.

In his April 12, 2001 deposition, Gilliam indicated that before this lawsuit and a subsequent newspaper article, he had no indication that anyone at the Hospital connected him to the Hospital's flyer, and that he was not harassed or ridiculed as a result of the flyer. Further, when directly asked, Gilliam failed to identify any mental or physical pain caused by the flyer's publication, aside from his own anger. Gilliam also testified that he suffered no adverse financial impact by way of a reduction in salary, demotion, or denial of bonuses or promotions, and that, in fact, he had not filed for any different position within the hospital after the flyer's publication. In summary, though asked in several different ways during his deposition, Gilliam failed to identify any specific financial damages, or damages to his reputation, caused as a direct result of the flyer.

A year after his deposition, however, on April 20, 2002, Gilliam stated in a sworn affidavit, filed in response to the defen-

10. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

11. 258 S.W.2d 917 (Ky.1953).

12. *Id.* at 918.

13. *Id.*

14. Restatement (Second) of Torts § 570 (1977).

15. *Walker v. Tucker*, 220 Ky. 363, 364–65, 295 S.W. 138, 139 (1927).

16. *Linn*, 383 U.S. at 65, 86 S.Ct. at 664.

17. *Linn*, 383 U.S. at 58 n. 2, 86 S.Ct. at 660 n. 2.

dants' motion for summary judgment, that he had suffered damages as a result of the flyer as follows:

> For approximately one week after the Cold Hard Truth Newsletter came out on July 13, 2000 I was asked several times about the Cold Hard Truth and who the Committee member was for the tardiness problem. I made no statements to anyone concerning the identity of the person mentioned in the Cold Hard Truth. A[t] least one employee from each division of the hospital during the course of my rounds began asking questions such as "Is it you Wes?" Again I did not mak[e] any statements regarding the identity of the person mentioned in the Cold Hard Truth newsletter. Shortly thereafter employees would point and snicker as I made my rounds. Approximately one month after the Cold Hard Truth memo appeared I was at Dr. Dale Adkins' office where a member of his staff made reference to the Cold Hard Truth newsletter and asked me about the ridicule I had received due to this newsletter.

> I have lost sleep over this incident. It has caused a strain on my marriage as well as my wife's business due to these baseless allegations being put forth by the hospital. It has caused to a certain degree a loss of intimacy in my marriage. I go out in public less frequently than before due to the fact that I wish to avoid any inquiries by people out in the community about this incident. It is very embarrassing and humiliating to have people come and ask you whether or not you are the one mentioned in a memo published to over 600 employees. My wife can testify as far as the impact it has had on our intimacy in our marriage as well as any business opportunities that she has had. In addition my wife is seeing the change in me and that I no longer wish to go out in public, such as not wanting to go out and do things that we used to do. We no longer attend hospital employee functions as it is a source of embarrassment to me.

> Subsequent to the Cold Hard Truth Newsletter coming out on July 13 2000 fewer and fewer hospital employees came to speak to me about their problems and ask me questions about the bargaining sessions with the hospital. Members of the Committee that I was on have made fun of me and have caused me embarrassment by their inquiries into this subject. As stated above I no longer go to hospital employee functions. I cannot help but feel that this false allegation was circulating or was circulated at the same time that I applied for a surgery technician position with the Pikeville Methodist Hospital. I was fully qualified for the position, and I feel but for this incident I would have obtained the position.

Thus, Gilliam's April 2002 affidavit differs sharply from his April 2001 deposition on several material issues.

■ The Kentucky Supreme Court recently noted that " '[a]s a general proposition, a deposition is more reliable than an affidavit.' "[18] While a post-deposition affidavit may be admitted to explain deposition testimony,[19] "an affidavit which merely contradicts earlier testimony cannot be submitted for the purpose of attempting to create a genuine issue of material fact" to

---

18. *Lipsteuer v. CSX Transp., Inc.*, 37 S.W.3d 732, 736 (Ky.2000) (quoting *Van Zweden v. Southern Pac. Transp. Co.*, 741 F.Supp. 209, 211 (D.Utah 1990)).

19. *Lipsteuer,* 37 S.W.3d at 736.

avoid summary judgment.[20]

 With respect to damages, Gilliam may not rely upon his April 2002 affidavit to demonstrate damages for purposes of defeating summary judgment, since that affidavit merely contradicts his earlier deposition testimony with regard to the same issue. As Gilliam failed to identify compensable damages in his deposition testimony, he failed to meet this element of his defamation case. Furthermore, Gilliam's failure to set forth his damages during his deposition constitutes a judicial admission which forecloses further dispute on the issue.[21]

With respect to the other elements of defamation in the context of this labor dispute, we note that we have reservations as to whether Gilliam met the "actual malice" standard since the record contains no evidence that either the Hospital or Briscoe knew of the statement's falsity or acted with reckless disregard as to its truth or falsity.[22] However, we need not address those issues since the record is clear that Gilliam admitted in his deposition that he suffered no damages as a result of the Hospital's flyer.

The order of the Pike Circuit Court is affirmed.

ALL CONCUR.

---

20. *Id.*

21. *Goldsmith v. Allied Bldg. Components, Inc.,* 833 S.W.2d 378, 380 (Ky.1992); *Sutherland v. Davis,* 286 Ky. 743, 749–50, 151 S.W.2d 1021,

1024 (1941); *see Hughes v. Vanderbilt University,* 215 F.3d 543, 549 (6th Cir.2000).

22. *New York Times,* 376 U.S. at 279–280, 84 S.Ct. at 725–26.