RENDERED: JULY 7, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0673-MR

ANDREA KEMPLIN AND LISA
KEMPLIN                                                                      APPELLANTS


                        APPEAL FROM CAMPBELL CIRCUIT COURT
v.                      HONORABLE DANIEL J. ZALLA, JUDGE
                        ACTION NO. 19-CI-00294


ST. ELIZABETH HEALTHCARE
D/B/A ST. ELIZABETH FORT
THOMAS AND ABDUL LATIF
BANIRE, PA-C                                                                 APPELLEES


                                OPINION
                                AFFIRMING

                            ** ** ** ** **

BEFORE: COMBS, McNEILL, AND TAYLOR, JUDGES.

COMBS, JUDGE: In this medical malpractice case, Andrea and Lisa Kemplin

appeal from the summary judgment granted by the Campbell Circuit Court in favor

of St. Elizabeth Healthcare d/b/a St. Elizabeth Fort Thomas (St. Elizabeth's) and

Abdul Latif Banire, a physician's assistant. The trial court struck from its record

the post-deposition affidavit of Dr. Denise Abernethy, the Kemplins' medical

expert, and concluded that the Kemplins could not prevail on their medical malpractice claim where they failed to show that the alleged negligence proximately caused Andrea's alleged injuries. Additionally, the court concluded that the Kemplins could not prevail on a claim under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C.[1] §1395dd(a), because that federal statute's provisions are inapplicable to the facts and circumstances. Finding no error after our review, we affirm.

Mid-morning on July 10, 2017, Andrea awoke feeling severe pain in the right side of her abdomen. She skipped a lunch date with Lisa because she did not feel well. In her deposition, Andrea explained that she had suffered on and off with cramps and pain in her abdomen accompanied by vomiting and very loose stools for a couple of months prior to the events of July 10. She had been seeing Dr. Sherri Schwartz, her primary care physician, for "stomach issues." Dr. Schwartz ordered a CT scan, an MRI, and an ultrasound, all of which revealed nothing remarkable. Dr. Schwartz prescribed an anti-nausea medication, antibiotics, and a sleep aid. Andrea testified in her deposition that nothing that Dr. Schwartz prescribed gave her much relief.

When Lisa returned from lunch between 4:00 and 4:15 p.m., she found that Andrea was suffering intense abdominal pain. Andrea asked her to dial

---

[1] United States Code.

911.  Andrea was transported by ambulance and arrived at St. Elizabeth's at 5:00 p.m., continuing to suffer abdominal pain and vomiting.

Medical records of her admission indicate that Andrea was seen first by a nurse and, once in a room, by Physician Assistant (PA) Banire.  Banire is employed by Compass Emergency Physicians, with which St. Elizabeth's contracts for professional services.  On the evening of July 10, 2017, Banire was under the direct supervision of Dr. Richard Stewart, also a Compass Emergency Physicians employee.

Banire reviewed notes prepared by emergency medical services personnel and talked with the nurse about Andrea's symptoms before he examined Andrea.  Andrea indicated to Banire that her pain was intense and that she had been treating for a month or so with Dr. Schwartz for abdominal pain.  Andrea told Banire that her last visit with Dr. Schwartz had been the week before.  Banire reviewed Andrea's medical records and confirmed that she had only recently undergone a CT scan, x-ray, and ultrasound.  He reviewed the results of the imaging studies and discovered nothing remarkable.

Banire conducted a physical examination of Andrea.  He palpated her abdomen, listened to her bowel, listened to her lungs, and listened to her heart rate. He found that she had "diffuse right-sided abdominal tenderness."  He reported that the patient did not exhibit distention, rebound tenderness, or guarding of the

abdomen. Banire specifically considered whether she was suffering with diverticulitis, appendicitis, or a perforated bowel and concluded that she was not. Ultimately, Banire was convinced that Andrea was not suffering with a surgical or acute abdomen.

Upon questioning by Andrea's attorney, Banire denied that patients with acute or complicated diverticulitis usually have right-sided pain. He confirmed that patients suffering with diverticulitis usually experience lower, left-sided abdominal tenderness because the sigmoid colon is generally involved. He also explained that symptoms of a perforated bowel specifically include rebound tenderness, abdomen rigidity, and guarding. Banire related that Andrea had none of these symptoms, and, as a consequence, he did not believe that she required a surgical consultation or intervention.

Banire consulted with his supervising physician, Dr. Stewart. He discussed Andrea's symptoms, explained his findings upon physical examination, and related her medical history. According to Banire, Dr. Stewart, too, reviewed Andrea's recent CT scan. Banire and Dr. Stewart agreed that there was no indication that Andrea had a surgical abdomen and that a repeat CT scan was unnecessary. Banire ordered standard lab work and, upon Dr. Stewart's recommendation, ordered an x-ray of Andrea's abdomen. The x-ray was unremarkable. Reflecting on his physical examination of Andrea, review of her

medical records (specifically including the imaging studies), the results of the lab work he had ordered, and his discussions with Dr. Stewart, Banire concluded that Andrea was most probably suffering with an acute flare-up of the chronic abdominal pain that was being treated by her primary care physician with a muscle relaxer and steroid. Less probably, he believed that she could be suffering with an upset gastrointestinal track. Banire ordered intravenous fluids, a painkiller, and an anti-nausea medication. Dr. Stewart agreed with Banire's treatment plan.

Banire explained to the Kemplins' counsel that he did not attribute Andrea's elevated white blood cell count to infection but rather to her ingestion of the steroid prescribed the week before or perhaps to the prolonged period of vomiting. He explained, "taking the exam in totality and everything with her chart and record, I did not suspect that she was infectious or had an acute abdomen or surgical abdomen." Banire reiterated that he did not order a CT scan for two reasons: (1) because Andrea had just had one, it "wasn't indicated that day after I saw and evaluated her"; and (2) because of patient safety -- "we try to reduce, you know, radiation exposure if it's not indicated in the ER."

Upon Banire's reevaluation of her later in the evening, Andrea indicated that she was still suffering pain. He palpated her abdomen again and was still satisfied that it was non-acute. Later, Banire reassessed Andrea's condition again. Andrea indicated to her nurse that her pain had subsided with a dose of

-5-

hydromorphone, and the nurse reported that Andrea was sleeping. Banire consulted again with Dr. Stewart, and they agreed that it was safe to discharge her. According to Banire, upon discharge at 9:30 p.m., Andrea was given standard instructions: to return to the emergency room if her symptoms returned, if she experienced new symptoms, and/or if her condition did not improve or if it worsened. He advised her to see Dr. Schwartz in one to four days and to consider making an appointment with a gastroenterologist.

In his deposition, Dr. Stewart explained to the Kemplins' counsel that the fact that Andrea arrived at the hospital by ambulance would not necessarily be an indication of the severity of her abdominal pain because the ambulance service was often used simply as a mode of transport. Dr. Stewart denied that an x-ray in the vertical position rather than supine would have been preferable in light of Banire's physical examination of the patient. He also denied that a repeat CT scan was warranted "because [Banire's] exam did not suggest any type of emergent abdominal process." He confirmed that an elevated white blood cell count is a "very nonspecific finding." He observed, "I think of stress, infection, medication, sometimes it's just a person's own slightly abnormal finding beyond the norm. That's such a, such a low deviation of high, it's very, very common finding in the ED workup when we see people under acute stress."

Dr. Stewart confirmed that Andrea's urinalysis showed no evidence of infection. He would not agree with counsel's proposition that "a progression from a simple to a complicated diverticulitis is unlikely to have occurred in less than 10 hours." He indicated "[w]ith review of this case, I think everything here was very appropriate, standard. . . . I see no indication for an abdominal CT based on what I've reviewed in this record."

He vehemently denied that there was a misdiagnosis at the visit to St. Elizabeth's on July 10, 2017. Dr. Stewart noted that the standard care for acute diverticulitis is "antibiotic coverage," but he decided that "[antibiotics] were not indicated at this time, as I see no other factor that would even suggest infection other than the nonspecific [slightly elevated white blood cell count]" for which there was a clear explanation – the steroid medication prescribed to Andrea by Dr. Schwartz.

In her deposition, Andrea explained as follows:

Q. Was the abdominal pain worse when you left [the hospital] that night?

A. Yes, it was. Again, it come and go -- gone because I was on a pain medicine of some sort.

Lisa drove Andrea home and stopped at a pharmacy to pick up her new prescriptions.

At home, Andrea slept off and on but continued to vomit and to suffer what she described as intense pain. When Andrea's vomit turned to a black substance, Lisa began making calls to Dr. Schwartz. When Dr. Schwartz returned a call to Lisa early on July 11, 2017, she advised Lisa to get Andrea back to St. Elizabeth's emergency room immediately.

Lisa confirmed in her deposition that Andrea had been suffering with pain in her upper right abdomen for "a good portion of June." "She had been to several appointments and tests and that nature." Lisa explained that Dr. Schwartz "mentioned that she didn't really see anything [on the imaging scans] and it could be a pulled muscle." She believed that Banire was in Andrea's room three or four times during the four and one-half hours that they were at the hospital.

Nevertheless, Lisa felt that Andrea's condition had deteriorated in the emergency room and was surprised that she was discharged that evening. She explained that she and Andrea stopped at Kroger to fill Banire's prescriptions at 9:55 p.m. and arrived back at home near 11:00 p.m. Andrea continued to vomit through the night and neither of them slept much. As a result, Lisa began calling Dr. Schwartz's emergency number "two to three, maybe even four times, couldn't really get ahold of anybody." Lisa remembered, "Dr. Schwartz called and told me to take her immediately back up. . . so at least by maybe five or six a.m. That's guessing." Lisa did not recall that Banire had given instructions to return to the

-8-

emergency room if Andrea's symptoms changed or did not improve or worsened and did not recall receiving any printed material concerning her care after discharge.

Medical records show that Andrea returned to the hospital at 7:25 a.m. A CT scan was performed, and a report of the scan was prepared by 10:30 a.m. Ultimately, upon consultation between the emergency room physician and a surgeon, Andrea was diagnosed with diverticulitis with a perforated bowel. She underwent surgery at around 1:00 p.m., during which a section of bowel was removed. During surgery, Andrea went into septic shock and later into cardiac arrest, requiring resuscitation and admission to St. Elizabeth's intensive care unit. No expert provided testimony to indicate when Andrea's bowel perforated.

On April 8, 2019, the Kemplins filed a negligence action against Banire and St. Elizabeth's in Campbell Circuit Court. On November 28, 2019, the Kemplins were granted leave to file a first amended complaint to assert a claim against Compass Emergency Physicians, P.S.C. (Compass Emergency Physicians), Banire's employer. Each of the defendants answered and denied the allegations against them. A period of discovery began.

The Kemplins named as their expert Dr. Denise Abernethy. She was deposed in Cincinnati on March 11, 2020. She agreed with deposing counsel that "an emergency medicine practitioner can act completely reasonably and within the

standard of care and miss a diagnosis of bowel perforation." She added that she was acting with "hindsight bias" when she sat down to review Banire's medical decisions and that she was unfamiliar with Banire's deposition testimony. Because of the known cancer risk, Dr. Abernethy agreed with counsel that "if an emergency room provider has a lower suspicion that a test such as a CT scan is indicated, then he or she should really think twice before ordering that test." She agreed that the statement was particularly relevant where a patient with the same or similar symptoms "has just had an abdominal CT scan seven to ten days prior."

She agreed that where Banire talked with Andrea, physically examined her, and had a low suspicion that an abdominal CT scan was indicated, "then it was certainly reasonable for him not to order that study knowing that she had had one ten days prior." She also agreed that "Andrea's history, when she presented on July 10th of 2017, was inconsistent with acute complicated diverticulitis" and that "three months of bowel symptoms would be also inconsistent with a surgical abdomen."

Dr. Abernethy agreed that it was reasonable for Banire to incorporate into his assessment the results of the abdominal CT scan that Andrea had undergone days before she arrived at the emergency room. Dr. Abernethy agreed that on July 10, 2017, the radiologist compared his view to the findings of the CT scan performed days earlier; that Banire was entitled to rely upon the report of the

-10-

radiologist; and that Banire had acted reasonably by considering that report in reaching his diagnosis.

She agreed that acute diverticulitis pain is most often in the sigmoid colon -- the lower left quadrant of the abdomen -- and that Andrea *did not* have pain in the lower left quadrant of her abdomen. Instead, Andrea reported and exhibited pain in her right abdomen. Dr. Abernethy agreed that the absence of rebound tenderness and rigidity of the abdomen are factors suggesting that the patient is not suffering with an acute abdomen.

Nevertheless, Dr. Abernethy opined that a diagnosis of complicated diverticulitis was missed during the emergency room visit and that a surgeon "would have probably asked for a repeat CT scan." **She specifically admitted that if asked whether Andrea's outcome would have changed in any way had Banire requested a surgical consult, she would have to speculate in order to provide an answer**.

It was Dr. Abernethy's opinion that Banire breached the standard of care because "I did not feel he considered acute diverticulitis." However, she indicated that "I can't tell from -- based on his exam" whether Banire considered diverticulitis. She admitted that not everything an emergency care provider thinks or does is reflected in his notes and that Banire's physical examination was consistent with his consideration of the diagnosis. Dr. Abernethy agreed that

-11-

Andrea did not have a fever and did not appear septic during her visit to the emergency room.

While she later opined that the standard of care required Banire to order an "abdominal series with an upright view" (rather than supine) or a CT scan, this opinion specifically presupposed that the care provider was considering a perforated bowel. However, she specifically admitted that it was within the standard of care, *under the facts and circumstances of this case* (where the patient's symptoms had persisted for months, the patient had taken a CT scan ten days before, findings after physical examination were inconsistent with a perforated bowel) for Banire *not* to order the abdominal series and that it was reasonable for him *not* to repeat the abdominal CT scan. She also admitted that it was equally possible that an upright view x-ray *would and would not* have indicated free air emanating from a perforated bowel.

Dr. Abernethy specifically agreed that if a surgical consult had been obtained on July 10, 2017, Andrea "may have had the exact same outcome." She indicated that if antibiotics had been started, "there's a much better chance of her having a better outcome"; however, she specifically declined to state that opinion to a reasonable degree of medical probability and admitted that she would have to defer to a surgeon's expertise on the matter. She also specifically deferred to a

surgeon's expertise as to whether the decision to administer antibiotics on the evening of July 10, 2017, would have prevented bowel perforation.

Dr. Abernethy stated that under the facts and circumstances, she could not take exception to Banire's discharge diagnosis of "generalized abdominal pain." However, she emphasized that she was "concerned about -- I felt that this patient, had the attending physician been staffed with or evaluated the patient, may have recommended a repeat CT scan." She admitted that she did not know whether Banire and Dr. Stewart had discussed Andrea's CT scan from days before her admission to the emergency room and specifically agreed that it would have been reasonable for Banire to defer to Dr. Stewart's judgment with respect to the need for a repeat CT scan. She also agreed that it would not be unreasonable for a well qualified emergency medicine physician to review the case and to conclude that Banire's care was entirely reasonable and met the standard of care.

Dr. Abernethy admitted that she would have to defer to a surgeon's expertise concerning the timeline of the progression of diverticulitis and could not give a specific opinion in terms of hours or days. She opined that Andrea "was deteriorating in the emergency department starting around 10:00 a.m." on July 11, 2017. However, she did not conclude that any hospital employee breached the standard of care with respect to the emergency care provided on the

evening of July 10, 2017, or with respect to the care and timing of the surgery on July 11, 2017.

In June 2020, St. Elizabeth's disclosed its expert witnesses. It represented that Patricia Howard, Ph.D., R.N., a certified emergency nurse at the University of Kentucky, would testify that the hospital's nurses provided appropriate nursing care and met the standard of care in Andrea's treatment. It represented that Gary Vitale, M.D., would testify that an earlier diagnosis of acute diverticulitis on the evening of July 10, 2017, would not have altered Andrea's outcome; that antibiotic treatment would not have prevented perforation of the sigmoid colon; and that a surgical consult would not have changed the fact that Andrea required surgical intervention and would not have changed her ultimate outcome. Among other things, Dr. Vitale would testify concerning the course and progression of diverticular disease, and he would opine that the timing and ordering of the CT scan, surgical consult, and surgery on July 11, 2017, were reasonable and within the standard of care.

Banire also disclosed his expert witness. Dr. Arthur M. Pancioli, professor of emergency medicine and chairman of the Department of Emergency Medicine at the University of Cincinnati, College of Medicine, would testify that the entirety of the care and treatment provided to Andrea on the evening of July 10, 2017, was reasonable and in accordance with the applicable standard of care. He

would testify specifically that Banire's decision not to order a repeat CT scan or a repeat MRI was reasonable and appropriate in light of the fact that Andrea's history of right upper quadrant pain and the report of diffuse right-sided abdominal pain were both inconsistent with the typical presentation for diverticulitis. He would confirm that the absence of both rebound tenderness and guarding of the abdomen explains why a reasonable clinician would not have suspected a perforation or the presence of free air in Andrea's abdomen. Finally, he would testify that nothing that Banire could do upon and/or during and/or subsequent to Andrea's presentation on the evening of July 10, 2017, would have avoided the development of the bowel perforation and her subsequent surgeries.

On June 9, 2020, Banire gave notice of the filing of the entirety of Dr. Abernethy's deposition testimony. Several days later, St. Elizabeth's, Banire, and Compass Emergency Physicians filed comprehensive motions for summary judgment. The Kemplins filed their response, arguing that genuine issues of material fact precluded entry of summary judgment. The motions were originally set for hearing on July 10, 2020, but the hearing date was rescheduled for August 28, 2020, in order to accommodate the schedule of Kemplins' counsel. However, counsel for the Kemplins failed to appear on this date. Ultimately, the hearing was rescheduled for September 22, 2020; November 20, 2020; December 17, 2020; and January 14, 2021.

On January 20, 2021, the Kemplins file a motion for an extension of time to complete discovery. On February 2, 2021, they filed a motion requesting an order of voluntary dismissal of their civil action without prejudice. The defendants did not object to an order of dismissal.

On February 10, 2021, the Campbell Circuit Court entered an order denying the motions for summary judgment. The trial court noted that "even under Kentucky's strict summary judgment standard, this case is a close call."

On February 12, 2021, the court orally granted the Kemplins' motion to dismiss the action during its regularly scheduled motion docket. However, before the court reduced the order to writing, the Kemplins filed a notice of withdrawal of their motion for a voluntary dismissal. Following a hearing conducted on March 12, 2021, the trial court concluded that the Kemplins' unilateral notice of withdrawal of the motion was sufficient, ruling that the matter would remain on the court's active docket. On June 3, 2020, the court granted the Kemplins' motion for extension of time to conduct discovery, warning that "no other extension will be granted except for extreme hardship." The new deadline was set for November 30, 2021.

In January 2022, after the extended deadline for discovery passed, St. Elizabeth's renewed its motion for summary judgment. It argued that the Kemplins failed to provide the medical evidence necessary to show that any

hospital employee violated the standard of care or caused injury. Additionally, it argued that the Kemplins could not show that it was vicariously liable for Banire's actions.

Banire and Compass Emergency Physicians also renewed their motion for summary judgment. They, too, argued that the Kemplins could not establish a *prima facie* case of medical negligence. Although the Kemplins' expert indicated that Banire could have: 1) obtained a surgical consult or 2) prescribed antibiotics to Andrea, they contended that Dr. Abernethy admitted that she could not opine to a reasonable degree of medical probability that Andrea's diagnosis, treatment, and/or outcome would have changed in any way if Banire had taken either or both of these actions. In response, the Kemplins filed a motion to reopen the discovery deadline. St. Elizabeth's, Banire, and Compass Emergency Physicians vigorously objected.

A week later, the Kemplins filed a substantive response to the motions for summary judgment and moved to strike the expert witness disclosures filed by the defendants. In their response, the Kemplins argued that the hospital was liable under provisions of EMTALA. They also argued that they had established the elements of medical negligence. They directed the trial court to sections of Dr. Abernethy's deposition testimony and "to the Affidavit of Denise Abernethy M.D., attached hereto as 'Exhibit 3' in which she restates her opinion in no uncertain

-17-

terms." This is the sole reference that the Kemplins make to the affidavit, and it does not appear to have been filed in the record. (The Kemplins' citation to the affidavit in the trial court's record by specific page reference on appeal is erroneous as it does not appear as cited.) In fact, the only copy of the affidavit in question appearing in the trial court record is affixed to Banire's motion to strike it.

St. Elizabeth's, Banire, and Compass Emergency Physicians filed replies specifically objecting to the Kemplins' reliance upon the provisions of EMTALA and to the filing of the post-deposition affidavit of Dr. Abernethy because it was untimely and directly contradicted her sworn deposition testimony. They filed separate motions to strike the affidavit. In the challenged affidavit, Dr. Abernethy indicated that a negligent screening examination led to Banire's alleged misdiagnosis.

By order entered on May 13, 2022, the trial court granted the motions for summary judgment and the motions to strike the post-deposition affidavit of Dr. Abernethy. The Kemplins filed a notice of appeal naming in its caption St. Elizabeth's and Banire as appellees.

On appeal, the Kemplins contend that the trial court erred by granting summary judgment. For our analysis, we have reordered the arguments presented in their appellate brief.

The Kemplins contend that the trial court erred by striking the post-deposition affidavit of Dr. Abernethy. We have noted that the affidavit does not appear to have been filed by the Kemplins. However, by addressing it, the trial court necessarily concluded that it had been. Consequently, we address the argument on its merits.

The Kemplins would be entitled to rely upon a post-deposition affidavit of Dr. Abernethy **only** where it explained her previous sworn testimony. *See generally Gilliam v. Pikeville United Methodist Hospital of Kentucky, Inc.*, 215 S.W.3d 56 (Ky. App. 2006). However, they could not rely upon the affidavit to contradict Dr. Abernethy's previous testimony in an effort to create an issue of material fact. *Id.* The trial court compared Dr. Abernethy's affidavit with her sworn deposition testimony and concluded that the statements contained in her affidavit did not simply restate, clarify, or amplify her earlier opinions. Instead, it contradicted them. We agree with that assessment.

In her post-deposition affidavit, Dr. Abernethy indicated, in part, that "based on reasonable medical probability, [Andrea] received a negligent screening examination leading to a missed diagnosis [at St. Elizabeth's] on July 10, 2017." However, as stated above, Dr. Abernethy had indicated unequivocally in her deposition testimony that "an emergency medicine practitioner can act completely reasonably and within the standard of care and miss a diagnosis of bowel

perforation." Additionally, she indicated in her deposition that Andrea's recent medical history (*i.e.*, her symptoms on the evening of July 10, 2017 and the results of Banire's physical examination) was inconsistent with a diagnosis of acute complicated diverticulitis or a surgical abdomen. In her deposition, she opined that it was reasonable for Banire and the radiologist to rely upon the prior CT scan and for Banire not to order repeat imaging -- particularly given the known cancer risks posed.

While Dr. Abernethy indicated in her deposition that the standard of care under the circumstances required an emergency care provider to consider acute diverticulitis as a diagnosis, she freely admitted that she could not say that Banire had failed to do so. Banire testified that he had specifically considered this diagnosis.

Although Dr. Abernethy opined in her deposition that the standard of care could require an "abdominal series with an upright view" or a CT scan, she agreed that under the facts and circumstances of this case it was reasonable for Banire *not* to order the abdominal series and reasonable for him *not* to repeat the abdominal CT scan. Moreover, she specifically agreed in her deposition that it would have been reasonable for Banire to defer to Dr. Stewart's judgment with respect to the need for a repeat CT scan. Ultimately, Dr. Abernethy indicated in her deposition that under the facts and circumstances, she could not take exception

to Banire's discharge diagnosis of "generalized abdominal pain." This testimony directly contradicts that part of Dr. Abernethy's subsequent affidavit indicating that Andrea received a negligent screening examination leading to a missed diagnosis.

In her post-deposition affidavit, Dr. Abernethy also indicated, in part, that "had [Andrea] been appropriately screened and diagnosed, she would more likely than not have avoided septic shock with end organ damage including cardiac arrest, heart failure, renal failure, and the need for emergency colon resection." However, in her sworn deposition testimony, Dr. Abernethy indicated unequivocally **that she could only speculate** if asked whether Andrea's outcome would have changed in any way if Banire had requested a surgical consult on the evening of July 10, 2017. Furthermore, she specifically declined in deposition testimony to state to a reasonable degree of medical probability that beginning a course of antibiotics on the evening of July 10, 2017, would have altered her outcome. Because the contents of Dr. Abernethy's affidavit expressly contradict her earlier sworn testimony rather than explaining or supplementing it, the trial court did not err by refusing to consider it. *Gilliam*, *supra*.

The Kemplins also challenge the trial court's refusal to strike certain hospital consent forms that it contends were unauthenticated as well as summaries of expert opinion testimony offered by St. Elizabeth's in its witness disclosure. However, as the Kemplins concede, the trial court expressly stated that it would

not consider the disputed documents in its analysis of the motions for summary judgment. If there was any error, it was harmless.

The Kemplins argue that even without the challenged affidavit, the trial court erred by concluding that they failed to produce evidence sufficient to show that a breach of the standard of care caused their alleged injuries. They contend that Dr. Abernethy's deposition testimony was sufficient to establish causation and that summary judgment was awarded in error. We disagree.

In most medical malpractice cases, plaintiffs are required to put forth expert medical testimony both to establish the applicable standard of care and to show a breach of the standard of care. *Blankenship v. Collier*, 302 S.W.3d 665 (Ky. 2010). Plaintiffs must also show through expert testimony that a breach of the standard of care was a proximate cause of injury. *Ashland Hosp. Corp. v. Lewis*, 581 S.W.3d 572 (Ky. 2019). In order to be the proximate cause of an injury, the conduct in question must be a substantial factor in causing the injury. *Id.* Moreover, causation "must be shown by a reasonable degree of medical probability, rather than mere possibility or speculation." *Id.* at 578. "[T]he medical testimony must be that an alleged negligent act probably caused the injury[.]" *Jackson v. Ghayoumi*, 419 S.W.3d 40, 45 (Ky. App. 2012). The Kemplins have never disputed that expert testimony was necessary to prove their

contention that St. Elizabeth's and Banire were negligent in diagnosing and/or treating Andrea on July 10, 2017.

In its order granting summary judgment, the trial court observed that the Kemplins had not produced sufficient evidence to establish that any breach in the standard of care by Banire caused the alleged injuries. It concluded that the Kemplins did not produce sufficient evidence to show that any employee of St. Elizabeth's had acted negligently.

Summary judgment is properly granted where "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR[2] 56.03. Because summary judgment involves only questions of law and not the resolution of disputed material facts, we do not defer to the trial court's decision. *Goldsmith v. Allied Building Components, Inc.*, 833 S.W.2d 378 (Ky. 1992). Instead, we review the decision *de novo*. *Cumberland Valley Contrs., Inc. v. Bell County Coal Corp.*, 238 S.W.3d 644 (Ky. 2007).

Before the trial court, "[t]he moving party bears the initial burden of showing that no genuine issue of material fact exists, and then the burden shifts to the party opposing summary judgment" to present evidence establishing an issue

---

[2] Kentucky Rules of Civil Procedure.

-23-

for trial. *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436 (Ky. App. 2001). That is, "[t]he party opposing a properly presented summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing the existence of a genuine issue of material fact for trial." *City of Florence, Kentucky v. Chipman*, 38 S.W.3d 387, 390 (Ky. 2001).

The Kemplins alleged that Andrea's bowel perforated and she required emergency surgery as a result of the medical negligence that occurred in the emergency room on the evening of July 10, 2017. They argued that Banire's breach of the standard of care caused him to misdiagnose Andrea, and that if she had been properly diagnosed, Andrea probably would have avoided septic shock and the need for emergency surgery. In their motions for summary judgment, St. Elizabeth's and Banire challenged the sufficiency of the Kemplins' proof of the allegations. Given the state of the record, they contended that the Kemplins could not establish a *prima facie* case of negligence.

We begin by noting that Dr. Abernethy's "feeling" that Dr. Stewart might have recommended a repeat CT scan had he personally evaluated Andrea was wholly speculative. While she criticized Banire's decisions not to prescribe antibiotics and/or not to order a repeat CT scan or an upright view x-ray, she admitted that Andrea's symptoms were inconsistent with acute complicated diverticulitis and/or a surgical bowel and that the standard of care did not require

-24-

Banire to disregard Dr. Stewart's input following their discussions or the radiologist's comparison of the supine x-ray and the previous CT scan.

Nor does Dr. Abernethy's opinion that a surgeon "would have probably asked for a repeat CT scan" establish that Banire breached the applicable standard of care. Ultimately, as far as it can be discerned, it was Dr. Abernethy's opinion that Banire would have breached the standard of care if he had failed to consider a diagnosis of acute diverticulitis. However, the only evidence of record indicates **that he did just that**.

Moreover, Dr. Abernethy agreed that if Banire had called for a surgeon on the evening of July 10, 2017, Andrea "may have had the exact same outcome." She admitted that it was within a surgeon's expertise and not her own to establish whether beginning antibiotics on the evening of July 10, 2017, would have prevented the bowel perforation. She did not conclude that any hospital employee or agent breached the standard of care with respect to the care or timing of the surgery performed on July 11, 2017. In fact, she admitted that she did not know the standard of care for surgery performed at the hospital.

Dr. Abernethy's deposition testimony does not indicate that Banire and/or St. Elizabeth's breached the applicable standard of care. She was unable to state with a reasonable degree of medical probability that the conduct of either Banire or any employee of St. Elizabeth's was a substantial factor in causing

injury. The expert opinion evidence in this matter was insufficient to raise a genuine issue of material fact. Consequently, the trial court did not err by granting summary judgment with respect to the negligence claims.

Separately, the Kemplins argue that expert medical testimony with respect to causation is not necessary to establish Andrea's "lesser injuries." They describe the "lesser injuries" as Andrea's "pain and injuries worsening on July 10, and the severe convulsions and resulting fall she suffered on July 11." They contend that expert medical testimony is not necessary because any layman could conclude from common knowledge and experience that such injuries do not happen where proper skill is exercised and care taken.

There is no medical evidence indicating that Andrea was given penicillin, no evidence that she suffered with convulsions as a result, and no evidence that she fell off the operating room table before surgery. There is no admissible evidence of record of any kind to support these allegations. Whether the injection of penicillin could have been a substantial factor in causing convulsions and whether Andrea suffered injury as a result are plainly not a matter of common knowledge or experience.

The Kemplins also argue that Andrea suffered worsening symptoms and additional pain as a result of a premature discharge from the hospital. This allegation, too, requires an expert's opinion. The decision to discharge a patient

involves medical judgment and is outside the scope of common knowledge or experience. The trial court did not err by rejecting the Kemplins' contention that expert opinion was unnecessary to establish a *prima facie* case of negligence with respect to these separate allegations.

Finally, the Kemplins argue that the trial court erred by concluding that St. Elizabeth's was entitled to judgment as a matter of law because the Kemplins failed to establish the hospital's standard of care through an expert witness. They contend that the relevant standard of care is established by the provisions of EMTALA. We disagree.

EMTALA was enacted by Congress in 1986 to prevent hospital emergency rooms from "dumping" patients (who lack insurance and cannot pay for their care) by referring them to other care providers. *Martin v. Ohio Cnty. Hosp. Corp.*, 295 S.W.3d 104 (Ky. 2009). The intent of the statute is to ensure that an emergency room care provider does not avoid screening a patient or transfers the patient for non-medical reasons before the emergency condition is stabilized. *Id.* It did not create a federal malpractice cause of action. *Id.*

EMTALA applies to all hospitals that participate in the federal Medicare program and imposes two primary obligations on those hospitals. First, when an individual shows up for treatment at a hospital's emergency room, "the hospital must provide for an appropriate medical screening examination . . . to

determine whether or not an emergency medical condition" exists. 42 U.S.C. §

1395dd(a). Second, if the screening examination indicates that an emergency

medical condition does exist, the hospital must ordinarily "stabilize the medical

condition" before transferring or discharging the patient. *Id.* § 1395dd(b)(1)(A).

The provisions of EMTALA were "not intended to guarantee proper diagnosis or

to provide a federal remedy for misdiagnosis or medical negligence." *Trivette v.*

*North Carolina Baptist Hosp., Inc.*, 131 N.C. App. 73, 75 (1998) (citing *Power v.*

*Arlington Hosp. Ass'n*, 42 F.3d 851 (4th Cir. 1994)). Once EMTALA's screening

requirements are met, the patient's subsequent diagnosis and medical care become

the hospital's legal responsibility. The legal adequacy of its diagnosis and

subsequent care is governed by state malpractice law -- not by EMTALA. *See*

*Trivette v. North Carolina Baptist Hosp., Inc.*, *supra.* Consequently, the trial court

did not err by concluding that the provisions of EMTALA do not relieve the

Kemplins from establishing the requisite standard of care in an effort to prove their

case.

We affirm the summary judgment of the Campbell Circuit Court.


ALL CONCUR.

BRIEFS FOR APPELLANTS:

Mark A. Humbert
Lindsay N. Foltz
Cincinnati, Ohio

Charles T. Lester, Jr.
Fort Thomas, Kentucky

BRIEF FOR APPELLEE ST. ELIZABETH HEALTHCARE D/B/A ST. ELIZABETH FORT THOMAS:

Ryan M. McLane
Olivia C. Keller
Covington, Kentucky

BRIEF FOR APPELLEE ABDUL LATIF BANIRE, PA-C:

Joel L. Peschke
Loveland, Ohio